**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Robert DeLEON, Jr., Defendant–Appellant.**

**No. 89–30230.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 2, 1990.

Decided Feb. 7, 1992.

Jeffrey K. Finer and Robyn L. Pugsley, Pat Stiley & Associates, Spokane, Wash., for defendant-appellant.

Stephanie J. Johnson, Asst. U.S. Atty., Spokane, Wash., for plaintiff-appellee.

Before HUG, and D.W. NELSON, Circuit Judges, and WALKER,* District Judge.

HUG, Circuit Judge:

On May 22, 1989, Robert DeLeon, Jr., was indicted for manufacturing marijuana,

* Hon. Vaughn R. Walker, United States District Judge for the Northern District of California, sitting by designation.

a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1). After the district court denied his motion to suppress evidence, DeLeon conditionally pled guilty to one count of manufacturing marijuana pursuant to a plea agreement offered under Fed.R.Crim.P. 11(a)(2). We affirm.

The principal issues are:

1. Whether the affidavit in support of the search warrant issued contained material omissions and whether then there was sufficient basis for the judge to find probable cause for the search.

2. Whether the applicable mandatory minimum sentencing provisions require application of the rule of lenity.

3. Whether the mandatory sentencing provisions of 21 U.S.C. § 841(b)(1)(B)(vii) violate the due process and equal protection provisions of the United States Constitution, because sentencing is based on the number of marijuana plants regardless of maturity, gender or actual drug abuse potential.

## I.

Robert DeLeon owned 40 acres of uncultivated land in Moses Lake, Washington. Local rumors circulated that DeLeon was in the business of growing marijuana. On February 21, 1989, three young men from Sunnyside, Washington, Frank and Charles Linedecker and Loren Brown, came to discuss the sale of farm equipment with DeLeon's neighbor, Frank Sharp. The three men saw a piece of equipment on DeLeon's property and expressed an interest in purchasing it. Sharp warned the men that there was a chance there was marijuana growing in the outbuilding (a shop building of metal construction) and that they "had better be very careful because they could get killed up there." Sharp stated that the men went onto DeLeon's property; and when they returned informed him that DeLeon was, indeed, growing marijuana in the outbuilding.

The information obtained from Sharp, as to the three men's statements, and from an interview with Loren Brown served as the basis for Sergeant Shay's affidavit in support of the search warrant that was issued.

## II.

■ DeLeon argues that Sergeant Shay intentionally or recklessly omitted material facts from his affidavit in support of the search warrant and, therefore, misled the issuing judge in his determination of probable cause. Thus, he contends the evidence obtained from the search must be suppressed.

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that a search warrant, valid on its face, may be voided and the fruits of the search suppressed if the affidavit supporting the warrant contains statements that are knowingly and intentionally false, or made with a reckless disregard for the truth, and if the false statement is necessary to the finding of probable cause. *Id.* at 155–56, 98 S.Ct. at 2676–77. In *United States v. Stanert*, 762 F.2d 775 (9th Cir.), *amended, reh'g denied*, 769 F.2d 1410 (9th Cir.1985), we extended the principles of *Franks* to deliberate or reckless omissions.

■ In order to mandate an evidentiary hearing on the questions, the defendant must only make a substantial showing of the essential facts. However, at the hearing, the defendant must prove the facts by a preponderance of the evidence. *Franks*, 438 U.S. at 156, 98 S.Ct. at 2676. The district judge in this case held an extensive *Franks* hearing.

Sergeant Shay's affidavit in support of the search warrant relayed Frank Sharp's conversation with the three young men from Sunnyside, Charles and Frank Linedecker and Loren Brown, and stated that the three young men told Frank Sharp that they had seen and smelled marijuana in the shop building on DeLeon's property. Attached to the affidavit were transcribed taped statements of Loren Brown and Frank Sharp. Loren Brown stated that: Frank Linedecker walked up to the DeLeon shop and said that it smelled like marijuana; Charles Linedecker and Loren Brown

walked over to the shop and it did smell like marijuana; Charles and Frank Linedecker tried to open the door about a foot and confirmed that marijuana was inside; and Loren Brown did not look inside the door or see any marijuana. Frank Sharp told Investigator Jurovich that the three young men from Sunnyside returned from DeLeon's property saying that Sharp was right, marijuana was growing on DeLeon's property; and that they saw some plants and could get high from the smell of marijuana just walking in the door.

The facts that the defendant contended were omitted were that:

1. Sharp had suspected for over two years that DeLeon was growing marijuana and had worked with Deputy Detrolio to develop probable cause to search. The inference was that, on this occasion, Sharp was acting as an agent for the Government and purposefully sent the three young men to snoop around DeLeon's building to find the marijuana.

2. Loren Brown's statements to Investigator Jurovich were inconsistent with Frank Sharp's concerning what the three men had observed at DeLeon's building.

3. Investigator Jurovich had made a call to Charles Linedecker, one of the three men involved, and Linedecker had stated he did not see anything, did not smell anything, and did not want to talk about it.

■ We reverse a district judge's findings of fact only for clear error. Here, Judge Quackenbush heard the testimony of Frank Sharp and found him to be credible. Sharp's testimony was that he was holding a sale of farm equipment and the three young men, who were in the dairy business, as was Sharp, came to buy equipment. From Sharp's property, they saw a piece of farm equipment on DeLeon's property that they were interested in buying. Judge Quackenbush found that Sharp had warned them that there was a pot growing operation on the property and that they should be careful, but had not sent the young men to the property for the purpose of assisting Deputy Detrolio in establishing probable cause. He found the incident occurred "by reason of the inquiry of the boys about the ownership of the equipment, and Mr. Sharp telling them to go up and talk to Mr. DeLeon, but to beware because there was a marijuana operation." He found Sharp was not operating in any manner as an agent of the Government.

With regard to the alleged failure to disclose the inconsistency between Brown's statement and Sharp's statement as to what had been seen and smelled, Judge Quackenbush noted that these inconsistencies were fully apparent to the issuing judge because transcripts of their taped statements were attached to the affidavit. Judge Quackenbush found that the statement of Charles Linedecker to Officer Jurovich should have been disclosed in the affidavit because it was knowledge within the department, although it may not have been known to the affiant, Officer Shay. However, he found that this omission would not have affected the issuing judge's determination to issue the warrant. The statement was explainable as a desire of Charles Linedecker, after the fact, not to get involved. He found that "a reasonable magistrate could conclude that there was probable cause to believe in that the three boys were quoted by Mr. Sharp as saying they smelled and saw marijuana on the property, and one of the boys stated in his statement that the other two had told him that they had seen and smelled marijuana. The fact that one of them thereafter denied seeing anything would not be the basis, in my opinion, for withholding the granting of the motion for the search warrant." After hearing expert testimony from Dr. Woodford, the judge also found that the marijuana operation at the DeLeon property was such that a smell of marijuana could well have existed on the day the boys were out there and that they would have recognized it from their past experiences.

There is adequate support in the record for these findings of the district judge, and he did not err in concluding that, even considering the omission of Linedecker's

statement, there was adequate support for the search warrant.

## III.

DeLeon contends that the mandatory minimum sentencing provisions of 21 U.S.C. § 841(b)(1)(B)(vii) require the application of the rule of lenity.

■ DeLeon first contends that ambiguities in the interplay of 21 U.S.C. §§ 802(16), 812, and 841(b)(1)(B)(vii) and the rule of lenity require that DeLeon's sentence be imposed according to the parallel sections of the Sentencing Guidelines. More specifically, DeLeon argues that § 841(b)(1)(B)(vii) does not direct the court whether to consider the weight of the controlled substance or the number of plants in determining the defendant's sentence. This argument has been considered before in the context of the United States Sentencing Guidelines. In *United States v. Graham,* 710 F.Supp. 1290 (N.D.Cal.1989), the Sentencing Guidelines were challenged as ambiguous for not specifying when number or weight of marijuana plants should be used to calculate a sentence. Judge Orrick concluded that the intent of the United States Sentencing Guidelines, § 2D1.1(a)(3), as applied to violations of § 841(a)(1), was to measure live marijuana by the number of plants and dry leaf marijuana by weight. A rationale for this method is that it is impossible to determine the number of plants from which processed marijuana is derived. We affirmed Judge Orrick's decision in *United States v. Corley,* 909 F.2d 359, 361 (9th Cir.1990) (under the Sentencing Guidelines, live marijuana plants are measured by number and dried marijuana by weight). Under the same rationale, the mandatory minimum sentencing provisions of 21 U.S.C. § 841(b)(1)(B)(vii) are not ambiguous; Congress intended live marijuana plants to be measured by number and processed marijuana by weight.

■ DeLeon's second argument is that the statute does not adequately define "marijuana plant." DeLeon asserts that commercially valueless male plants, immature starter plants, and two-leaf cotyledons should not be included within the definition of a "marijuana plant" because they are not commercially viable. Hence, punishment on the basis of sheer number of plants would not be related to drug abuse potential.

We have discussed the common definition of the word "plant" and have found the meaning clear and have rejected the argument that plants shorter than one foot should be excluded from the definition of a "marijuana plant" within the meaning of the United States Sentencing Guidelines. *Corley,* 909 F.2d at 361–62. *Accord, United States v. Carlisle,* 907 F.2d 94, 96 (9th Cir.1990) (small cuttings are "marijuana plants" within the meaning of the Sentencing Guidelines).

Section 841(b)(1)(B) expressly disregards the weight of individual marijuana plants where sentencing is imposed according to the number of plants in possession. This reflects Congress's decision that the size or maturity or weight of individual plants should not be a consideration in sentencing. The sheer number of more than 100 plants, regardless of maturity or gender, represents a marijuana grower's potential harvest and an intent to sell.

■ DeLeon's third contention is that the Government's method of storage caused the plants to deteriorate such that it is impossible to determine whether the seized plants were Cannabis sativa L., which is within the express definition of "marijuana plant" in section 802(16), or Cannabis sativa I. Our circuit, along with several other circuits, has addressed the issue of what varieties of Cannabis are within the definition of "marijuana" in 21 U.S.C. § 802(16) and concluded that Congress intended to outlaw all plants popularly known as marijuana to the extent that those plants possess THC. *United States v. Kelly,* 527 F.2d 961, 964 (9th Cir.1976); *see also United States v. Honneus,* 508 F.2d 566 (1st Cir.1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975) (Congress meant to include any and all marijuana producing Cannabis when specifying "Cannabis sativa L."). *Accord, United States v. Walton,* 514 F.2d 201, 203

(D.C.Cir.1975); *United States v. Moore*, 446 F.2d 448, 450 (3d Cir.1971), *cert. denied*, 406 U.S. 909, 92 S.Ct. 1617, 31 L.Ed.2d 820 (1972) (Cannabis indica variety is included in definition of marijuana as set forth in 26 U.S.C. § 4761(2)). Thus, De-Leon's argument that the Government's methods of storing the seized marijuana plants deprived him of the opportunity to prove that the plants were not Cannabis sativa L. within the definition of 21 U.S.C. § 802(16), is meritless.

■ Having determined that sections 841(b)(1)(B) and 802(16) are not ambiguous, we need not apply the "rule of lenity" as articulated in *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971) (ambiguity in criminal statutes should be construed in favor of the defendant).

## IV.

■ DeLeon contends that the mandatory sentencing provisions of section 841(b)(1)(B)(vii) violate the Fifth and Fourteenth Amendment due process and equal protection guarantees because the provisions are not rationally related to a legitimate government interest. DeLeon asserts that the sentencing provisions punish according to the number of marijuana plants seized and not according to plant maturity, gender, or actual drug abuse potential. That section provides that in case of the violation of section 841(a) (manufacture of a controlled substance) involving "100 kilograms or more of a substance containing a detectable amount of marijuana or 100 or more marijuana plants regardless of weight," the violator "shall be sentenced to a term of imprisonment which may not be less than 5 years...."

The mandatory sentencing provisions of 21 U.S.C. § 841(b)(1)(B), which impose penalties according to quantity rather than purity of illegal narcotics, have been held to be rationally related to a legitimate government interest in protecting society from large volume drug dealers. *See United States v. Klein*, 860 F.2d 1489, 1500–01 (9th Cir.1988); *United States v. Savinovich*, 845 F.2d 834, 839 (9th Cir.),

*cert. denied*, 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358·(1988); *United States v. Holmes*, 838 F.2d 1175, 1177 (11th Cir.), *cert. denied*, 486 U.S. 1058, 108 S.Ct. 2829, 100 L.Ed.2d 930 (1988) (Anti–Drug Abuse Act of 1986 is rationally related to the objective of protecting public health and welfare by implementing stiff and certain penalties for those who violate federal drug laws). In *United States v. Hoyt*, 879 F.2d 505, 512 (9th Cir.), *amended*, 888 F.2d 1257 (1989), the court upheld the constitutionality of the classifications based on quantity rather than purity of the illegal drugs for mandatory sentencing under 21 U.S.C. § 841(b)(1)(A).

In *Savinovich*, 845 F.2d at 839, the court upheld the 21 U.S.C. § 841(b)(1)(B)(ii) classification scheme of mandatory imprisonment of five years without parole for possessors of more than 500 grams of cocaine against an equal protection challenge. The court reasoned that the statute was directly related to Congress's desire to prevent both wholesale and retail distribution of illegal drugs, and to punish dealers possessing substantial street quantities of drugs more severely. *Savinovich*, 845 F.2d at 839.

Although our cases upholding the mandatory sentencing provisions of 21 U.S.C. § 841(b)(1)(B) involved due process and equal protection challenges to sentencing according to the quantity of cocaine, the rationale is equally applicable to marijuana. DeLeon's assertion that sentencing should be metered according to plant maturity, gender, or actual drug abuse potential is essentially a quantity versus purity argument, which this circuit has already rejected. Accordingly, DeLeon's due process and equal protection challenges to the sentencing provisions of section 841(b)(1)(B) are unavailing.

AFFIRMED.

WALKER, District Judge, dissenting:

I respectfully dissent from the majority's disposition of this case. The majority apparently concedes that a deliberate or reckless omission by a government official who is not the affiant can be the basis for a *Franks* suppression. That any court could entertain notions to the contrary is, frank-

ly, incomprehensible. The Fourth Amendment places restrictions and qualifications on the actions of the government generally, not merely on affiants. Corrupt government officials cannot keep from affiants information material to the determination of probable cause and by this scheme of affidavit laundering evade their constitutional obligations.

The Supreme Court heeded this point in *Franks v. Delaware*, 438 U.S. 154, 163–64 n. 6, 98 S.Ct. 2674, 2680–81 n. 6, 57 L.Ed.2d 667 (1978), and at least one circuit has explicitly stated this tacit but obvious premise. *United States v. Pritchard*, 745 F.2d 1112, 1118 (7th Cir.1984). Regrettably, the majority does not apply the logic of these decisions to the facts at bar.

The possibility of official misconduct in applying for an affidavit is particularly strong in a case such as this, involving a defendant who had for years been suspected of marijuana moonshining. The authorities showed appropriate restraint in the past in not applying for a warrant based on a variety of anonymous and hearsay statements, particularly given the non-exigent nature of the suspected crime, involving neither violence nor mobile contraband. This restraint should not have been abandoned.

If the omitted information had been included in the application for the search warrant, no reasonable person could have found probable cause to issue the warrant. One of the alleged eyewitnesses told Investigator Jurovich that he neither saw nor smelled marijuana on appellant's property. Yet Jurovich purports to have construed this denial as a refusal to cooperate, and so characterized the conversation when he related his information to the affiant, Sergeant Shay.

DeLeon's neighbor, Frank Sharp, claimed that Frank and Charles Linedecker and Loren Brown told him they saw and smelled marijuana growing on DeLeon's property. Brown, however, denied seeing marijuana, and said he was not sure that the Linedeckers were able to see any, either. The interview transcript appended to the application for a warrant makes this clear.

The warrant application does not include the denial of Charles Linedecker, one of the two men who allegedly attempted to look inside the building that contained the marijuana. Since both percipient witnesses who were questioned denied seeing marijuana, Sharp's hearsay statement to the contrary should be seen for what it was—the product of Sharp's vivid imagination, hostility to his neighbor, or both.

The only remaining peg on which to hang the warrant is Brown's claim to have *smelled* marijuana on DeLeon's property. But there was no finding that Brown was qualified to recognize the odor of growing marijuana, which doubtlessly differs from the odor of cured or burning marijuana. To the extent that the Supreme Court's dictum in *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), can be any guide, it clearly states that odors can be the basis for probable cause if a magistrate "finds the affiant *qualified* to know the odor." *Id.* at 13, 68 S.Ct. at 369. Nothing in this record indicates that Brown is qualified to detect the odor of the growing plants, save his claim that he had been around an unspecified form of marijuana some years prior.

A warrant simply cannot be based on the claim of an untrained or inexperienced person to have smelled growing plants which have no commonly recognized odor. The majority's acceptance of this smell theory opens a remarkable new front in the war on drugs. But in so doing, the majority unwittingly turns this effort into an assault on the Constitution: a person's private property cannot be invaded by the government absent probable cause.

I also take issue with the majority's application of the mandatory minimum sentencing provisions of 21 U.S.C. § 841(b)(1)(B)(vii). An enhancement provision that is based on the sheer number of plants, without regard for drug abuse potential, is not rationally related to a legitimate government interest. This circuit has justified the quantity approach to sentencing, as opposed to a purity approach, by ascribing to Congress a so-called "market-oriented approach" in passing the Anti-Drug Abuse Act of 1986. *United States v.*

*Savinovich*, 845 F.2d 834, 839 (9th Cir. 1988). Albeit seriously misnamed, as there is nothing market-oriented about it, this approach focuses its wrath upon those who distribute at the retail level, by increasing the penalties the closer the product is to ultimate users. This, presumably, is because the harm to society from these individuals is more immediate than from those farther up the distributive chain.

Accordingly, marijuana producers under the 1986 Act are sentenced based on the weight of the mixture containing marijuana without regard to the purity of the substance. This presupposes that marijuana purchasers will accept any mixture as long as it contains some marijuana, and are indifferent to its purity.

That dubious proposition aside, the point here is that the 1986 Act also introduced the concept of enhanced sentencing for marijuana based on a counting of plants. Pub.L. 99–570, § 1003(a)(1)(C). This concept, extended further in 1988, conflicts with the "market-oriented" presumption that quantity increases and purity drops the nearer that drugs are to the streets. That the inverse is true for marijuana had long been recognized by Congress, as marijuana had been defined since 1970 to include only the portions of plants that have drug abuse potential. 21 U.S.C. 802(16). It makes no sense to weigh only the portions of cut plants that have drug abuse potential, but when it comes to growing plants to count them regardless of their drug abuse potential.

This establishes a perverse punishment scheme which would penalize more heavily marijuana producers who are caught earlier rather than later in the production process even though their efforts supposedly pose less of a threat to society. The count of all plants regardless of drug abuse potential is a poor proxy for the intent of the producer. The expert testimony in the record at bar indicates that a producer should know that half of his plants will turn out male and 70% of his seedlings and cotyledons will not reach maturity. A producer intending to produce a given retail quantity of marijuana must have a larger number of plants early in the process than late.

If the court does not construe "plants" to mean marijuana plants with drug abuse potential, the anomalous situation could arise in which a person with 100 male plants, posing no immediate threat to society, must receive a minimum sentence of five years, but a street dealer with 99 kilograms of marijuana must not. This is a system that punishes producers of marijuana plants less harshly, but retailers of processed marijuana more severely, the closer their respective wares are to market. To the extent that marijuana production and distribution are integrated, the punishment varies greatly depending when in the process the arrest is made. The approach lacks a consistent connection to the supposed threat to society.

I am aware of nothing in the legislative history to indicate that the 100 plant threshold is already the result of a discounting based on drug abuse potential, or that there is a rational distinction between the treatment of marijuana and other drugs when it comes to sentencing. The majority's reading of 21 U.S.C. § 841(b)(1)(B) results in a classification scheme that violates the due process and equal protection guarantees of the United States Constitution.