**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Edward Robert TRAYNOR,
Defendant–Appellant.**

**No. 92–30079.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 7, 1992.

Decided April 13, 1993.

Patrick K. Stiley, Spokane, WA, for defendant-appellant.

Earl A. Hicks, Asst. U.S. Atty., Spokane, WA, for plaintiff-appellee.

Before: WALLACE, Chief Judge, WRIGHT and LEAVY, Circuit Judges.

WALLACE, Chief Judge:

Following his conditional guilty plea to manufacturing marijuana plants in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, Traynor appeals the district court's denial of his motions to dismiss the indictment and to suppress evidence. Traynor also challenges his sentence. The district court exercised jurisdiction pursuant to 18 U.S.C. § 3231. Traynor's plea agreement expressly reserved his right to appeal. We thus have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm.

**I**

On November 6, 1990, Spokane County Sheriff's deputies Walker and Madsen drove to Traynor's residence in order to investigate a tip that a marijuana growing operation was located there. The deputies turned off a public thoroughfare onto a private road and drove until they came to a locked gate where a "No Trespassing" sign was posted. Although the gate completely obstructed the road, no fences were attached to it, and beaten paths were visible on both sides of the gate.

The deputies walked around the gate and Walker approached the residence while Madsen continued down the driveway toward an outbuilding, or shop. When Walker received no response to his knock on the front door, he went to the back door and knocked and called out; nobody responded.

Madsen knocked on the shop door and called out, receiving no response. Without entering a fenced-in area surrounding three sides of the shop, Madsen walked around to the east side of the shop. As he approached the back corner of the shop, Madsen heard a buzzing sound which he identified as consistent with the sound of an electrical ballast used to support halide grow lights, commonly used for indoor marijuana cultivation. Madsen also detected the distinctive odor of freshly harvested or growing marijuana.

Walker then walked to the shop from the back door of Traynor's house. When he reached the shop, Walker also smelled what he believed to be freshly harvested or growing marijuana and heard the buzz of the ballasts. The deputies left after spending approximately five minutes at Traynor's residence.

Based on the information gathered on November 6, a state judge issued a search warrant which was executed at Traynor's residence on November 8, 1990. Spokane County Sheriff's deputies, assisted by Drug Enforcement Administration Special Agents, seized a total of 88 budding sinsemilla marijuana plants along with related cultivation equipment.

Shortly after execution of the search warrant, Walker presented the information to the United States Attorney for the Eastern District of Washington. Federal authorities chose to defer a decision whether to prosecute.

On April 18, 1991, Traynor was charged in Washington State court with one felony count of possession of a controlled substance. Washington authorities offered

Traynor a plea agreement that would have resulted in no incarceration. Walker again contacted the United States Attorney. The state charges were dropped before Traynor entered his guilty plea, and on September 10, 1991, the government filed an indictment against Traynor.

Traynor moved to dismiss the indictment as violative of his due process rights because the referral of his case to federal prosecution was arbitrary. He also filed a motion to suppress evidence, arguing that the November 6 incursion by the deputies violated the Fourth Amendment. The district court held hearings on Traynor's motions to dismiss and to suppress evidence. After these motions were denied, Traynor and the government entered into a plea agreement permitting Traynor to appeal the order denying his motions to dismiss and to suppress evidence, as well as any disputed sentencing issues. Traynor then entered a conditional guilty plea. The district court accepted the plea and based on the total number of marijuana plants, male as well as female, sentenced Traynor to 41 months in prison followed by 6 years of supervised release. This appeal followed.

## II

Traynor argues that the district court erred in holding that his Fourth Amendment rights were not implicated by the warrantless search of the shop. Because "the Fourth Amendment's protection accorded 'persons, houses, papers and effects' d[oes] not extend to the open fields," resolution of this issue turns on whether the shop is within the protected curtilage of Traynor's home. *United States v. Dunn,* 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 324 (1987) (*Dunn*). The district court found that the shop was not part of the curtilage, and therefore denied Traynor's motion to suppress.

### A.

▪ Generally, a district court's conclusion whether an officer's intrusion upon a defendant's property constituted a search under the Fourth Amendment resolves questions of law and is reviewed de novo.

*United States v. Roberts,* 747 F.2d 537, 540 (9th Cir.1984). A district court's factual findings, however, are reviewed for clear error. *United States v. Nance,* 962 F.2d 860, 862 (9th Cir.1992) (*Nance*). The curtilage inquiry requires a court to determine whether an area " 'harbors those intimate activities associated with domestic life and the privacies of the home.' " *United States v. Calabrese,* 825 F.2d 1342, 1350 (9th Cir.1987) (*Calabrese*), *quoting Dunn,* 480 U.S. at 301 n. 4, 107 S.Ct. at 1139–40 n. 4.

▪ This determination mandates consideration of several factors that bear on the relationship of a given structure or area "to the home itself." *Dunn,* 480 U.S. at 301, 107 S.Ct. at 1140. The Supreme Court stated that

> curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id.*

Three circuits have concluded that this inquiry is an essentially factual one, the district court's resolution of which is reviewed for clear error. *United States v. Acosta,* 965 F.2d 1248, 1255 (3d Cir.1992); *United States v. Hatch,* 931 F.2d 1478, 1480 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 235, 116 L.Ed.2d 191 (1991); *Hodges v. United States,* 243 F.2d 281, 283 (5th Cir.1957). Other circuits, including our own, have yet to pass upon the question of the proper standard of review.

▪ Even if the curtilage question is viewed as a mixed one of law and fact, because the determination requires an "essentially factual" inquiry, *United States v. McConney,* 728 F.2d 1195, 1202 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), we join the Third, Fifth, and Eleventh Circuits in holding that a district court's determination whether an area is within the protected

curtilage of a home "should be classified as one of fact reviewable under the clearly erroneous standard." *Id.* The district court's finding is to be upheld unless we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Woods v. Graphic Communications*, 925 F.2d 1195, 1199 (9th Cir.1991). Under the clearly erroneous standard, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Service Employees Int'l Union v. Fair Political Practices Comm'n*, 955 F.2d 1312, 1317 n. 7 (9th Cir.) (*Service Employees*), *cert. denied*, — U.S. —, 112 S.Ct. 3056–57, 120 L.Ed.2d 922 (1992), *quoting Anderson v. City of Bessemer*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Our task in this case is thus to determine whether the district court clearly erred in holding that Traynor's shop was not within the curtilage of his home.

### B.

■ In *Dunn*, the Supreme Court ruled that a barn located on Dunn's property was not accorded Fourth Amendment protection because it lay outside the curtilage of Dunn's house. 480 U.S. at 296, 107 S.Ct. at 1137. The Court held that the barn was in "open fields," *id.* at 304, 107 S.Ct. at 1141, which "may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech." *Oliver v. United States*, 466 U.S. 170, 180 n. 11, 104 S.Ct. 1735, 1741 n. 11, 80 L.Ed.2d 214 (1984) (*Oliver*), *quoted in Dunn*, 480 U.S. at 304, 107 S.Ct. at 1142.

Police officers had crossed over Dunn's perimeter fence, proceeded to his driveway, followed the driveway to the fence immediately behind Dunn's house, crossed over that fence and one other, and arrived at the barn wherein they saw a phenylacetone laboratory. *See United States v. Dunn*, 674 F.2d 1093, 1096 (5th Cir.1982). Despite having trespassed on Dunn's property and crossed over a fence less than ten yards behind Dunn's house, *see United States v. Dunn*, 782 F.2d 1226, 1228 (5th Cir.1986) (map depicting Dunn's ranch), when the police officers arrived "at their vantage point ... outside the curtilage of the house and in the open fields upon which the barn was constructed, ... the Constitution did not forbid them to observe the phenylacetone laboratory." 480 U.S. at 304, 107 S.Ct. at 1141.

The obvious implication of *Dunn* is that observations made by officers while they are not within the curtilage of a house do not constitute a search under the Fourth Amendment. This reading was adopted by the Fifth Circuit in *United States v. Pace*, 955 F.2d 270 (5th Cir.1992) (*Pace*). In *Pace*, two officers, acting on a tip, entered Pace's property "by squeezing through a gap between the main gate and a fence post" and knocked on the door and looked through a window of Pace's house to determine nobody was home. *Id.* at 273. The officers then crossed two more gates, went to the back of a barn located approximately 50 feet from the house and looked through a small opening. They spotted marijuana plants in the barn, and used that information as the basis for a search warrant. *Id.* The Fifth Circuit, applying *Dunn*, held that because the barn was not within the curtilage of Pace's house, the observations of the officers made while standing outside the barn "did not violate the Fourth Amendment's proscription of searches within the curtilage of the home." *Id.* at 275–76.

■ Under *Dunn* and *Pace*, it does not matter that officers first trespass upon property that is obviously curtilage (the fence behind the house in *Dunn;* the front door and window in *Pace*) while investigating a tip, as long as the incriminating observations themselves take place outside the protected curtilage. The whole issue, then, boils down to whether or not the area in question is curtilage.

The Court in *Dunn* was careful to point out that although four factors are of primary relevance in making the curtilage determination,

> combining these factors [does not] produce[] a finely tuned formula that, when mechanically applied, yields a "correct" answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.

480 U.S. at 301, 107 S.Ct. at 1139–40. "[T]he central component of this inquiry [is] whether the area harbors the 'intimate activity associated with the "sanctity of a man's home and the privacies of life." ' " *Id.* at 300, 107 S.Ct. at 1138–39, *quoting Oliver*, 466 U.S. at 180, 104 S.Ct. at 1742, *quoting Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886).

### C.

■ The district court relied on the *Dunn* factors to determine that the "officers did not intrude into areas protected by the Fourth Amendment." The court did not make extensive factual findings in its order, but the transcript of the suppression hearing discloses a sufficient basis to hold that the finding that Traynor's shop was not within the protected curtilage of his house is not clearly erroneous.

*First* (proximity): The shop is 70–75 feet away from Traynor's house. This distance is approximately 25 feet further than the structures in *Pace*, 955 F.2d at 273, and *Calabrese*, 825 F.2d at 1350, which were found to be outside the curtilage.

*Second* (enclosure): Although there is intermittent perimeter fencing around Traynor's property, no fence is attached to the front gate leading to Traynor's driveway, and the shop and Traynor's house are not enclosed within a single fenced-in area. Dunn's ranch was entirely surrounded by a perimeter fence. The proper focus of this factor is on whether interior fencing clearly demarcates the curtilage. *See Dunn*, 480 U.S. at 302, 107 S.Ct. at 1140. In this case, the only interior fencing is the partial fencing around the shop which, if anything, serves to segregate the shop from Traynor's home. The deputies did not enter into this fenced-in area.

*Third* (use): The shop was devoted solely to the growing of marijuana. "It is especially significant that the law enforcement officials possessed objective data indicating that the barn was not being used for intimate activities of the home." *Id.* As in *Dunn*, the deputies here detected smells and sounds associated with illicit activity which intensified as they approached the outbuilding. *See id.* at 302–03, 107 S.Ct. at 1139–40. The deputies smelled marijuana and heard the telltale buzz of an electrical ballast.

The deputies' observations together with the informant's tip that there was a marijuana growing operation on the Traynor property "indicated to the officers that the use to which the [shop] was being put could not fairly be characterized as so associated with the activities and privacies of domestic life that the officers should have deemed the [shop] as part of [Traynor's] home." *Id.* at 303, 107 S.Ct. at 1141. Traynor does not argue that the shop was used for any purpose other than growing marijuana.

*Fourth* (visibility): The district court found that Traynor took no steps, such as building a fence or other barrier, to shield the area from view of persons standing on adjacent property. The shop was only 45 feet from Traynor's property line, and Traynor admitted that he had done nothing to prevent any person from coming up within 45 feet of the shop and viewing it. Traynor "did little to protect the [shop] from observation by those standing in the open fields." *Id.*

■ Analysis of the four factors supports the district court's finding that the shop is not "so intimately tied to the home itself" as to be accorded the protections associated with a residence's curtilage. Traynor's briefs focus on the driveway and backyard, arguing that he had a reasonable

expectation of privacy in his driveway because of a "No Trespassing" sign and that his backyard is within the curtilage of his house. All of that is beside the point. Under *Dunn* and *Pace*, it is irrelevant that the deputies trespassed on Traynor's curtilage in the course of their incursion onto his property. Under *Oliver*, the presence of a "No Trespassing" sign does not itself create a legitimate expectation of privacy. 466 U.S. at 182, 104 S.Ct. at 1743. The issue is whether the shop itself, where the incriminating observations took place, is within the curtilage of the house. The district court found that it is not. This finding is "plausible" on the record viewed as a whole. *See Service Employees*, 955 F.2d at 1317 n. 7. As such, there was no Fourth Amendment violation, and we affirm the district court's denial of Traynor's motion to suppress.

## III

■ Traynor next argues that the district court erred in denying his motion to dismiss the indictment and violated his due process rights because his case was referred to federal prosecutors in the absence of written referral guidelines. This issue is foreclosed by recent Ninth Circuit decisions. In *Nance*, 962 F.2d at 864–65, we rejected the argument that a defendant's due process rights are violated when state law enforcement authorities refer a "case for federal rather than state prosecution without the benefit of a neutral written policy governing such referrals." It does not matter if, as appears to be the case here, the decision to prosecute in federal court was motivated by the availability of harsher sentences. *Id.* at 865.

"[R]ecent decisions of this court ... hold that absent proof of discrimination based on suspect characteristics, we may not review charging decisions made by prosecutors." *Id., citing United States v. Redondo–Lemos*, 955 F.2d 1296, 1300–01 (9th Cir. 1992); *United States v. Diaz*, 961 F.2d 1417, 1420 (9th Cir.1992). Traynor alleges no such discrimination. Rather, Traynor attempts to distinguish *Nance* by arguing that while the question in that case was

whether federal authorities violated due process in deciding to prosecute, the question presented here is whether the Washington State authorities violated due process when they reneged on their plea agreement and referred the matter a second time to federal authorities only after becoming frustrated with their own state processes. To the extent that the issue in this case differs from that in *Nance*, we disagree with Traynor's contention that this difference is in any way material and conclude that the rationale and holding of *Nance* apply in this situation as well. Because Traynor has not alleged that any of the charging decisions were based on an improper discriminatory motive, we may not review them.

In his reply brief, Traynor also contends that "there is evidence here of vindictive prosecution." This issue was not raised in Traynor's opening brief, and has been waived. *Nevada v. Watkins*, 914 F.2d 1545, 1560 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991).

## IV

Lastly, Traynor contends that the district court erred in failing to exclude male marijuana plants from the total number of marijuana plants used to calculate Traynor's sentence. The district court's interpretation of the United States Sentencing Guidelines (Guidelines) is reviewed de novo. *United States v. Blaize*, 959 F.2d 850, 851 (9th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2954, 119 L.Ed.2d 576 (1992).

Until recently, this issue had apparently been settled by *United States v. DeLeon*, 955 F.2d 1346, 1350 (9th Cir.1992), which rejected DeLeon's argument that the Guidelines "violate the due process and equal protection provisions of the United States Constitution, because sentencing is based on the number of marijuana plants regardless of maturity, gender or actual drug abuse potential." *Id.* at 1348. The dissent argued that the "market-oriented approach" underlying the Anti–Drug Abuse Act of 1986 required consideration of such factors in determining whether a particular marijuana plant should count to-

ward the total number used for sentencing. *Id.* at 1352–53 (Walker, J., dissenting).

This opinion was withdrawn on November 10, 1992, and a new opinion was filed. *United States v. DeLeon,* 979 F.2d 761 (9th Cir.1992). The new majority opinion reverses the district court on a separate issue, and does not reach the sentencing questions. *Id.* at 763.

■ Nevertheless, we adhere to the reasoning applied to this question by the original majority opinion in *DeLeon.* In *United States v. Corley,* 909 F.2d 359, 361 (9th Cir.1990), we held that under the Guidelines, live marijuana plants are measured by the number of plants. In *United States v. Carlisle,* 907 F.2d 94, 96 (9th Cir.1990), we rejected the argument that small cuttings are not marijuana plants within the meaning of the Guidelines. The direction of authority is not to consider a particular plant's potential for abuse when applying the straightforward language of 21 U.S.C. § 841(b)(1)(D), which bases sentencing on "50 or more marihuana plants regardless of weight."

■ The language of the statute is plain. As the district court pointed out, "[a] marijuana plant is a marijuana plant." Tetrahydrocannabinol (THC), the psychoactive ingredient in marijuana, is more concentrated in the female plant's flower buds. It is not obviously irrational for Congress not to distinguish between male and female marijuana plants, regardless of THC level, any more than it is irrational for Congress not to consider the weight or size of the plants. It would be improper for us to delve into economic philosophy in order to circumvent the unambiguous language of this statute. We thus join the Eighth Circuit, which recently rejected the "argument that only the female marijuana plants may be counted in calculating" the base offense level. *United States v. Curtis,* 965 F.2d 610, 616 (8th Cir.1992). The issue is for Congress, not the courts, to consider further.

**AFFIRMED.**