THACKER, Circuit Judge,
dissenting:
The Fourth Amendment is clear: “The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and. seizures, shall not be violated.” U.S. Const, amend. IV. In several recent decisions, the Supreme Court has reaffirmed that at its “very core,” the Fourth Amendment stands for “the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.” Florida v. Jardines, — U.S. -, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) (internal quotation marks omitted).
“This right would be of little practical value if the State’s agents could stand in a home’s porch or side garden and trawl for evidence with impunity.” Id. at 1414. Although my good colleagues in the majority *376 cast this decision narrowly based on the facts found by the district court, see ante at 3 (“The district court found as fact that at the time of the trash pull, the trash can was sitting on common property of the apartment complex.”), even accepting the facts found by the district court, I cannot subscribe to a version of the Fourth Amendment that permits agents of the state to conduct a warrantless search of a citizen’s trashcan where the receptacle is located directly behind their home and not otherwise abandoned or left for collection along a public thoroughfare, see California v. Greenwood, 486 U.S. 35, 39-41, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). For these reasons, I respectfully dissent.
I.
A.
The Area of the Search
The property of concern in this case is part of a larger development called Whit-comb Court, which is owned and managed by the Richmond Redevelopment Housing Authority (“Housing Authority”). Whit-comb Court is made up of a number of buildings each containing six row houses. Jackson’s home was located in one of these buildings and was adjacent to Anniston Street in Richmond, Virginia. The building located next to Jackson’s building is also next to Anniston Street, but is angled such that the two buildings appear similar in form to two sides of a triangle, leaving a funnel-like opening through which residents may access Anniston Street. See J.A. II Ex. I.[1]
A wrought iron fence separates Anni-ston Street from the apex point at which the two buildings meet, leaving only the funneled opening in the fence for an internal walkway that intersects the public sidewalk along Anniston Street.[2] See J.A. II Ex. 11, Ex. 12. Notably, it is undisputed that the internal walkway is not a “through” walkway. No alleys, no through sidewalks, no driveways, and no streets transect or abut the area directly behind Jackson’s home where the trash pull was conducted. And, according to Whitcomb Court property manager Clementine Robinson, the areas behind the residences— the patio areas — are private areas of each tenant. J.A. at 112; see also J.A. at 122 (Jackson’s neighbor, Asia Morris, stated that the patio area is her “private area.”); J.A. II Ex. 2, Ex. 3, Ex. 12.
Moreover, the area where the trash pull occurred is surrounded by “no trespassing” signs.positioned by the Housing Authority. Six “no trespassing” signs were affixed to each building in Whitcomb Court, one on each side of the buildings, and two on the front and the back of each building. The signs read, “NO TRESPASSING By the Order of RRHA,” the Richmond Redevelopment Housing Authority. The signs are white with black lettering and are readily observable, night or day. In fact, Officer Michael Verbena *377 testified that the area behind the two buildings was “private property,” that there were two “no trespassing” signs on the interior back sides of both of the buildings facing where the trash pull was conducted, and that the signs are “clearly marked.” J.A. at 58, 68; J.A. II Ex. 2, Ex. 11, Ex. 12.
B.
The Weekly Trash Collection
Significantly, in order for the trash collectors to pick up the trash from Whit-comb Court, the trashcans behind each residence must be brought by the tenants from their rear patios, along the Whitcomb Court internal walkway,' around the apartment building, through the opening in the wrought iron fence, past several “no trespassing” signs, and to the public curb on Anniston Street. Indeed, the trash collectors do not traverse behind the row houses and onto the patios of the residences or the internal walkway to pick up trash. The trash is not left for collection behind the residences; only when the trash is brought to the public street is it exposed to public passersby and subject to collection by the trash removal company.'
C.
The Location of the Trashcan
Even accepting the location of the trashcan as found by the district court in a light most favorable to the Government, the receptacle was assuredly on the home’s cur-tilage and plainly safe from a warrantless search by agents of the state.
Nonetheless, the precise location of the trashcan at the time of the search is in dispute, and for good reason. Jackson’s investigator, Linda McGrew, testified that property manager Robinson told her that she had never seen a trashcan on the internal walkway at Whitcomb Court, and that the'trashcans are instead kept on the patio areas of each residence. Each witness who lived in the development likewise testified that trashcans are not kept on the walkways in Whitcomb Court. Jackson’-s neighbor Sharice Smith testified that there is a rule in the apartment complex against having trashcans on the walkway. Smith also stated that she had never seen a trashcan in Whitcomb Court on the walkway in her five years of living there. Asia Morris, who lived next door to Jackson, likewise testified that in all the years she lived at Whitcomb Court, she had never se'en a trashcan on the internal walkway.
In contrast, Officers Verbena and Eric Fitzpatrick presented inconsistent versions of events.
Officer Fitzpatrick testified that the trashcan was located “on the sidewalk,” meaning the internal rear walkway at Whitcomb Court.[3] J.A. 98. He then stated that in the photograph that is depicted in Exhibit 2 he was standing “approximately where the trashcan was located on that sidewalk.” J.A. 59-61, 98-99; J.A. Ex. 2. In that photograph, Officer Fitzpatrick appears to be standing completely on the walkway. However, Officer Fitzpatrick indicated that the trashcan could have been “inches” in one direction or another. J.A. 102.
Notably, the officers’ pictorial recreation of where the trashcan was located on the night in question actually took place six and a half months after the fact, in preparation for the then-forthcoming suppres *378 sion hearing.[4] Officer Fitzpatrick also confirmed that it was dark the night of the trash pull and that he had done at least ten trash pulls with Officer Verbena on that particular night. Significantly, however, in Officer Verbena’s affidavit for .the search warrant of Jackson’s residence— generated on the same day as the trash pull — he described the trashcan as being situated “directly behind” the residence, with no mention of it being on or near the internal walkway. J.A. II 9.
• Officer Verbena’s testimony contained further troubling inconsistencies. Initially, Officer Verbena testified that the trashcan was “seven to ten yards from the back door off the sidewalk,” J.A. 54, “right off the sidewalk.” J.A. 53 (emphasis supplied).[5] Then, when the district court asked specifically how far the trashcan was from the sidewalk, Officer Verbena altered his testimony and said the trashcan was “basically almost touching the sidewalk, if not on — partly on the sidewalk.” J.A. 55. Finally, in response to the district court’s question regarding how far the trashcan was from the patio, the trashcan “moved” further to a point at which it was “almost completely on the sidewalk. So I’d say maybe a foot off the patio actually is where the trashcan was, give or take.” J.A. 56 (emphasis supplied). So, in the span of time from the point at which Officer Verbena drafted his search warrant affidavit on the day of the trash pull to the time he testified at the suppression hearing eight and a half months later, the location of the trashcan, shifted from 1) “directly behind” the residence; to 2) “off’ the side7 walk; to 3) “if not on — partly on the sidewalk;” and, finally, to its ultimate resting place 4) “almost completely on the sidewalk.” J.A. 53-56; J.A. 9.
Crediting a less constitutionally offensive version of the officers’ shifting and conflicting testimony, the district court found that the trashcan was at the time of the search located “immediately adjacent” to the walkway running behind Jackson’s home, as well as “positioned partially on” the walkway, “with the lid opening toward the house.” United, States v. Jackson, 3:11CR261-HEH, 2012 WL 529814, at *4 (E.D.Va. Feb. 17, 2012).
The district court did not explain whether the trashcan was also touching the patio or if it was located on the small patch of grass or cement step between the internal walkway and Jackson’s patio. The district court was simply not clear about the precise location of the trashcan. This is perhaps understandable given the state of the officers’ shifting testimony in this case. But, the location of the trashcan is of monumental importance for determining curtilage, property interests, and legitimate privacy interests. Even accepting the district court’s finding that the trashcan was at least “positioned partially on” the internal walkway, id., logic dictates that the remainder of the receptacle would have also been resting on the patio or the small patch of grass or cement step directly behind Jackson’s residence — an area the district court should have determined was curtilage as a matter of law.
Indeed, the district court rested its decision on its finding that the trashcan was “adjacent” to the internal walkway, which was in its view “publicly accessible” and a “common easement,” although this latter term is not defined in the record. J.A. *379 177-78. There is some dispute regarding how accessible the internal walkway was to members of the public, but it is clear from the fence along Anniston Road and the fact that the walkway was not a “through-way,” that the internal walkway was for residents and their guests accessing the back patios-not for members of the public to use as a path to another destination. This conclusion becomes more clear in light of the numerous “no trespassing” signs posted all along the complex walls.
II.
The Fourth Amendment “establishes a simple baseline ...: When ‘the Government obtains information by physically intruding’ on persons, houses, papers, or effects, ‘a search within the original meaning of the Fourth Amendment’ has ‘undoubtedly occurred.’ ” Florida v. Jardines, — U.S. -, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) (quoting United States v. Jones, — U.S.-, 132 S.Ct. 945, 950-951 & n. 3, 181 L.Ed.2d 911 (2012)). The Supreme Court has denoted this original understanding of the Fourth Amendment as embodying a “common-law trespassory test.” Jones, 132 S.Ct. at 952.
A Fourth Amendment violation also occurs when government officers violate a person’s “reasonable expectation of privacy.” Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Notably, “though Katz may add to the baseline, it does not subtract anything from the Amendment’s protections “when the Government does engage in [a] physical intrusion of a constitutionally protected area.’” Jardines, 133 S.Ct. at 1414 (quoting United States v. Knotts, 460 U.S. 276, 286, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (Brennan, J., concurring)); see also Jones, 132 S.Ct. at 952 (“[T]he Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test.” (emphases removed)).
Thus, in conducting a search, the Government may violate an individual’s Fourth Amendment rights in two different ways: 1) by physically intruding on the individual’s property in an unreasonable manner, and 2) by violating an individuals reasonable expectation of privacy. In my view, the warrantless search of Jackson’s trashcan, located directly behind his home in a private area, was an unreasonable search under both approaches.
A.
The Protection of Property Interests
The Fourth Amendment “ ‘indicates' with some precision the places and things encompassed by its protections’: persons, houses, papers, and effects.” Jardines, 133 S.Ct. at 1414 (quoting Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)). Although not all investigations conducted on private property are subject to the-Amendment’s protection, see Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924) (recognizing the “open fields” doctrine), “when it comes to the Fourth Amendment, the home is first among equals.” Jar-dines, 133 S.Ct. at 1414. The Supreme Court explained: . -
At the Amendment’s “very core”, stands “the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.” Sil-verman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). This right would ■ be of little practical value if the State’s agents could stand in a home’s porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man’s proper *380 ty to observe his repose from just outside the front window.
We therefore regard the area “immediately surrounding and associated with the home”—what our cases call the curtilage—as “part of the home itself for Fourth Amendment purposes.” Oliver, [466 U.S.] at 180, 104 S.Ct. 1735.... This area around the home is “intimately linked to the home, both physically and psychologically,” and is where “privacy expectations are most heightened.” California v. Ciraolo, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).
Id. at 1414-15 (emphasis supplied). Thus, we first look to whether the trashcan at the time of the warrantless search was located on the curtilage of Jackson’s residence.
The Supreme Court has prescribed a multi-factor test to guide curtilage determinations:
[Cjurtilage questions should be resolved with particular reference to four factors: [1] thé proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.
United States v. Dunn, 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). The Court cautioned, however, that “these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration — whether the area in question is so intimately tied to the home itself that it should be placed under the home’s ‘umbrella’ of Fourth Amendment protection.” Id.[6]
Crediting the testimony of Officers Verbena and Fitzpatrick, the district court concluded that the trashcan was beyond the curtilage of the home at the time of the trash pull because, at that time, it was “positioned directly next to the sidewalk, with a portion of the can actually protruding onto the sidewalk,” and “not chained or otherwise secured.”[7] United States v. Jackson, 3:11CR261-HEH, 2012 WL 529814, at *4 (E.D.Va. Feb. 17, 2012). I disagree.
1.
Proximity of the Area to the Home
“There is not ... any fixed distance at which curtilage ends.” United States v. Brezo, 308 F.3d 430, 435 (4th Cir.2002) (internal quotation marks omitted). “Rather, in determining whether the area searched was intimately tied to the home, ... the proximity of the area to the home must be considered in light of the other Dunn factors.” Id. (internal quotation marks and citation omitted). Based on Officer Verbena’s testimony as credited by the district court, the trashcan “was located seven to ten yards from the back door of the house, past a concrete patio which extends approximately twenty feet out from the rear entrance.” Jackson, 2012 WL 529814, at *5.
In United States v. Brezo, we reasoned that while the defendant’s garden, the location of the disputed search, “was only 50 feet from his house [and] would permit a conclusion that the garden was within- the curtilage, it does not compel such a conclu *381 sion.” 308 F.3d at 436. Cf. United States v. Depew, 8 F.3d 1424, 1427 (noting that distance of 60 feet is close enough to permit a finding of curtilage if other factors support such a finding). Similarly, in this case the district court’s factual determination that the trashcan was at most 30 feet from Jackson’s backdoor is not alone dis-positive as to a finding of curtilage. However, when viewed in light of the enclosed environment of the housing complex and the nature of the location’s purpose — i.e., to store noxious waste far enough away from the home but not left for collection— the relatively close proximity of the trashcan to the rear of Jackson’s home counsels strongly in favor of concluding the trashcan was within the curtilage.
2.
Enclosure of the Area
We must also consider “whether the area is included within an enclosure surrounding the home.” Dunn, 480 U.S. at 301, 107 S.Ct. 1134. “The proper focus of this factor is on whether interior fencing clearly demarcates the curtilage.” Brezo, 308 F.3d at 436 (quoting United States v. Traynor, 990 F.2d 1153, 1158 (9th Cir. 1993) (internal quotation marks omitted)). In this case, there was no enclosure of Jackson’s individual unit within the building. But nearly as important, the building containing Jackson’s home was largely enclosed. As noted, the main point of access to Jackson’s home is through a funneled opening of the wrought iron fence just off the public sidewalk along Anniston Street. See J.A. II Ex. 11, Ex. 12. Opposite Jackson’s patio, the courtyard is bounded by the rear of the neighboring row houses. See J.A. II Ex. 1, Ex. 4. And at the opposite end of the funneled entry to Anni-ston Street, the courtyard is hemmed in by a retaining wall bordering a neighboring baseball field. See J.A. II Ex. 1, Ex. 4. Thus, the building of which Jackson’s home is a part is at least partially enclosed, as it is bounded on all sides in one form or another. See United States v. Redmon, 138 F.3d 1109, 1130 (7th Cir. 1998) (en banc) (Posner, J., dissenting) (“The curtilage would rarely extend beyond the house itself if complete, opaque enclosure were required. New people, other than the very wealthy, barricade their front yard so completely that a person seeking to enter must request the unlocking of a solid gate that is higher than eye level.”).
3.
The Uses of the Area
In this case, the area claimed to be the curtilage includes the patio immediately behind Jackson’s home, as well as the grass surrounding it between the patio and the internal walkway. The patio includes a clothesline, held by two posts. Each residential unit is required by the development’s rules to keep residents’ trashcans, among other items of personal property, on the patio area. Thus, the patio area is essentially the individual resident’s back yard.
Although the Government claims that this area was “accessible” by-the public, it fails to point to any facts suggesting the patios were actually put to public use. And, critically, the officers them'selves conceded that the rear walkway was not subject to “through” traffic, and that the area behind the two buildings was “private property.” See J.A. 58, 67-68, 91. Merely because members of public can or have on occasion accessed the rear walkway and courtyard does not mean the Government may conduct warrantless searches of the entire area with abandon. Such logic re *382 duces the residents’ curtilage to a nullity.[8]
4.
Steps Taken to Protect the Area from Observation
Here, the area claimed to be the curti-lage by Jackson is completely open to his Whitcomb Court neighbors: no fences or other barriers inhibit open observation from the rear courtyard area of the complex. Nevertheless, the courtyard area between the buildings is secluded from public view (from the public street-sidewalk area) by a metal fence. More importantly, there are multiple “no trespassing” signs located on the rear wall of the two apartment row buildings. Indeed, according to the property manager and residents, the areas behind the individual units — the patio areas — are private areas of each tenant. See J.A. at 112, 122. Clearly, this was not an area designed to allow unhindered public travel and public observation; rather, it was limited to residents and their guests.[9]
Upon consideration of the Dunn factors as applied to the facts of this case — even crediting the officers’ shifting testimony (which was inconsistent at best) — the district court’s legal conclusion that the trashcan was -not located on Jackson’s curtilage was error. The proximity of the trashcan to Jackson’s home, and the fact that the area was largely enclosed, militate in favor of determining that the trashcan was indeed within the curtilage.
B.
The Protection of Privacy Interests
In addition to the search of the trashcan being unreasonable under the trespassory test, Jackson had a reasonable expectation of privacy in his trashcan when it had not been left for collection, but was rather kept behind the home for temporary storage of personal waste. As noted by the Court in Jardines, this analysis overlaps with the property interest-based Fourth Amendment analysis. See Jardines, 133 S.Ct. at 1418-19 (Kagan, J., concurring).[10] *383 As explained, the protections of the Fourth Amendment are also activated when the state conducts a search or seizure in an area in which there is a “constitutionally protected reasonable expectation of privacy.” New York v. Class, 475 U.S. 106, 112, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (citation omitted).
The seminal case governing analysis in this regard is California v. Greenwood, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). In Greenwood, the Supreme Court held that a defendant has no reasonable expectation of privacy in refuse left for collection on or “at the side of a public street that is readily accessible to animals, children, scavengers, snoops, and other members of the public.” Id. at 40, 108 S.Ct. 1625. The Court explained that the defendants:
placed their refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents’ trash or permitted others, such as the police, to do so. Accordingly, having deposited their garbage in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it ... respondents could have had no reasonable expectation of privacy in the incul-patory items that they discarded.
Id. at 40-41, 108 S.Ct. 1625 (internal quotation marks and citations omitted) (emphasis supplied).
In contrast, here Jackson’s trashcan was not placed at the public curb for collection, but, rather, was located on the internal walkway of the Whitcomb Court building complex “directly behind” Jackson’s residence. See J.A. II 9. Indeed, the officers acknowledge that the trashcan was located at or near the internal walkway next to Jackson’s patio and the district court found that it was located adjacent to the internal walkway. Therefore, it is incorrect to say that Jackson’s garbage — like Greenwood’s — could be searched by the police because where it was placed was accessible to “animals, scavengers, and snoops.” Greenwood, 486 U.S. at 40, 108 S.Ct. 1625. Greenwood’s garbage was not on private property or on his curtilage; Jackson’s was. The Government does not explain how Jackson’s trashcan was any less accessible to “animals, scavengers, and snoops” had it been located entirely on his patio. Id.
The Government appears to contend that the conclusion it reaches, namely, that Jackson had no reasonable expectation of privacy, follows naturally from Greenwood. See Government’s Br. at 22 (“The key factor ... is whether the ‘respondents exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection.’ ” (quoting Greenwood, 486 U.S. at 40, 108 S.Ct. 1625)). But any entitlement the police may have to search the trashcan is dependent upon its location on the defendant’s property, as the location is in this case the primary indicator of whether Jackson intended to relinquish his legitimate expectation of privacy. Storage of the trashcan so close to the rear of his home — within its curtilage, I submit — indicates that it was not intended to be relinquished.
Further, as explained, members of the public intent on scavenging or snooping in Jackson’s trash would need to access it by 1) stepping onto the internal walkway through the opening in the fence alongside *384 Anniston Street; 2) travelling along the internal walkway from the street, between the two fences and the two buildings, which leads only to the private courtyard and patio areas; and 3) at the fork in the walkway that leads either to the walkway behind Jackson’s building or to the walkway behind the opposite building, taking the walkway to the left to Jackson’s patio area, passing multiple “no trespassing” signs in the process. Appellant estimates, and the Government does not dispute, this entire trek from the public sidewalk where trash is left for collection to the rear of Jackson’s residence where the trash pull occurred is approximately 50 yards from start to finish. Thus, Jackson’s reasonable privacy interest remains intact under Greenwood.
In sum, the officers’ unjustified probe of Jackson’s trashcan when not left for collection or otherwise abandoned constituted a search falling under the purview of the Fourth Amendment under the principles recently espoused in Jardines as well as those set forth in Katz. Absent a warrant or the presence of any exception thereto, the officer’s trawling, exploratory search was patently unreasonable. Accordingly, the district court erred by refusing to suppress the evidence tainted by the fruits of the illegal search of Jackson’s trashcan.
III.
For the foregoing reasons, I would reverse the judgment of the district court.
*385 [[Image here]]
*386 [[Image here]]
*387 [[Image here]]
*388 [[Image here]]
*389 [[Image here]]
*390 [[Image here]]

. In order to maintain clear distinctions among the various paved areas, I denote the public strip of pavement parallel to Anniston . Road as the "sidewalk,” and that directly behind each of the two buildings at Whitcomb Court as the internal "walkway.”

. See supra note 2 and accompanying text. While the officers use the term ''sidewalk” to describe the internal paved path between the buildings of Whitcomb Court, I adopt the more accurate term "walkway.”

. The trash pull occurred at approximately 4:00 a.m. on May 26, 2011. The photographs purporting to recreate the location of the trash pull were taken on December 13, 2011. The suppression hearing was held on February 14, 2012.

. See supra note 3.

. "While the boundaries of the curtilage are generally 'clearly marked,’ the 'conception defining the curtilage’ is at any rate familiar enough that it is "easily understood from our daily experience.” Jardines, 133 S.Ct. at 1415 (quoting Oliver, 466 U.S. at 182 n. 12, 104 S.Ct. 1735).

. See supra note 3.

. The district court reasoned, "by placing the trashcan adjacent to the sidewalk — readily accessible to neighbors and other visitors in the apartment complex — the defendant exposed the trashcan to the public-at-large____” Jackson, 2012 WL 529814 at *6. In response to the residents’ undisputed testimony that the internal walkway was "not generally accessed by strangers,”- the district court responded: "However, this was not a gated community. Residents, visitors, and other non-residents could access the common area and the sidewalk at will." Id. at *6 n. 5.
But, citizens with smaller lot sizes should not be accorded any less Fourth Amendment protection than those who have the luxury of much larger grounds, including larger driveways and back yards such that they may store their, trash at a further distance from the public collection point.

. The Government claims that because its officers and Jackson's investigator were able to come and go on the apartment complex property without difficulty on a few occasions, we should consider the area completely "public” despite the "no trespassing” signs. However, whether the rule against trespassing was enforced on these particular occasions does not make the presence of the signs any less important for the multifactor curtilage determination.

,Justice Kagan's concurring opinion in Jar-dines makes this clear:
It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property naturally enough influences our shared social expectations of what places should be free from governmental incursions. And so the sentiment "my home is my own,” while originating in property law, now also denotes a common understanding — extending even beyond that law's formal protections — about an especially private sphere. Jardines' home was his property; it was also his most' intimate and familiar space. The analysis proceeding *383 from each of those facts, as today’s decision reveals, runs mostly along the same path. Jardines, 133 S.Ct. at 1418-19 (Kagan, J., concurring) (internal quotation marks and citations omitted).