PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
                *Plaintiff-Appellee,*

v.                                                    No. 01-4722

EUGENE GEORGE BREZA,
                *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of West Virginia, at Clarksburg.
Irene M. Keeley, Chief District Judge.
(CR-01-12)

Argued: September 25, 2002

Decided: October 28, 2002

Before WILKINS, WILLIAMS, and KING, Circuit Judges.

Affirmed by published opinion. Judge Wilkins wrote the opinion, in which Judge Williams and Judge King joined.

## COUNSEL

**ARGUED:** Wells Hemann Dillon, St. Marys, West Virginia, for Appellant. **ON BRIEF:** Thomas E. Johnston, United States Attorney, Stephen Donald Warner, Assistant United States Attorney, Clarksburg, West Virginia, for Appellee.

**OPINION**

WILKINS, Circuit Judge:

Eugene George Breza pleaded guilty to manufacturing 100 or more marijuana plants, *see* 21 U.S.C.A. § 841(a)(1) (West 1999), reserving the right to appeal the denial of his motion to suppress. He now argues that his right to be free from unreasonable searches and seizures was violated when law enforcement officers conducted aerial surveillance of his property and subsequently entered, and seized marijuana plants from, a vegetable garden that Breza asserts was within the curtilage of his home. For the reasons set forth below, we affirm.

I.

Breza owns a 92-acre farm in Gilmer County, West Virginia. Only part of this land, surrounding the house, is landscaped. This area consists of a lawn and a vegetable garden from which the marijuana was seized. The house and the landscaped portion of the yard are surrounded by a perimeter fence made of posts and wire. The lawn extends approximately 50 feet from the back of the house to the vegetable garden, which is separated from the lawn by a post-and-wire fence with a gate; the perimeter fence doubles as the back fence of the garden. In addition to the fence, an ornamental garden and several trees separate the vegetable garden from the lawn.[1] The portion of the vegetable garden where the marijuana was growing was shielded by artichoke plants and grapevines, so that the marijuana could not be viewed from outside the garden by one standing on Breza's lawn.

While conducting a routine drug interdiction operation, law enforcement officers flew over Breza's property in a helicopter at a height of approximately 500 feet. When one of the officers observed what he believed to be marijuana growing in the garden, the helicopter pilot descended to approximately 200 feet above the property.[2]

---

[1]The record does not contain information regarding the size or dimensions of the vegetable garden or the amount of produce it yielded.

[2]Breza testified that the helicopter descended much lower, to less than 100 feet and perhaps as low as 35 feet. The district court credited the Government's version of events, however.

After confirming the presence of marijuana, the helicopter ascended to navigable airspace and radioed nearby officers stationed on the ground, who immediately proceeded to Breza's property. Officers searched the garden and seized several hundred marijuana plants.

After he was indicted, Breza moved to suppress the marijuana on the basis that the aerial surveillance of his property and the warrantless entry of his vegetable garden violated his Fourth Amendment rights. Following a hearing, the district court rejected both arguments and denied the motion to suppress. Breza thereafter entered a conditional guilty plea.

## II.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by governmental actors. U.S. Const. amend. IV. The "touchstone" of Fourth Amendment analysis is whether the individual has a reasonable expectation of privacy in the area searched, *Oliver v. United States*, 466 U.S. 170, 177 (1984), *i.e.*, "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment," *id.* at 182-83. Thus, "[a] 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *see Illinois v. Andreas*, 463 U.S. 765, 771 (1983) ("If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no 'search'. . . ."). Whether certain conduct by law enforcement officers infringes upon rights guaranteed by the Fourth Amendment is a question of law subject to de novo review. *See United States v. Gomez*, 276 F.3d 694, 697 (5th Cir. 2001); *United States v. Rusher*, 966 F.2d 868, 873 (4th Cir. 1992). Underlying factual findings, however, are reviewed for clear error. *See Rusher*, 966 F.2d at 873. "A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Faulconer v. Comm'r*, 748 F.2d 890, 895 (4th Cir. 1984).

## A.

Breza first maintains that the aerial surveillance of his property violated his Fourth Amendment rights because the surveillance consti-

tuted a warrantless search of the curtilage of his home. *See Oliver*, 466 U.S. at 180 (defining curtilage as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life'" (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886))). Because an individual ordinarily possesses the highest expectation of privacy within the curtilage of his home, that area typically is "afforded the most stringent Fourth Amendment protection." *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976). Nevertheless, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). "Thus, a law enforcement officer's observations from a public vantage point where he has a right to be and from which the activities or objects he observes are clearly visible do not constitute a search within the meaning of the Fourth Amendment." *United States v. Taylor*, 90 F.3d 903, 908 (4th Cir. 1996) (internal quotation marks omitted).

On two occasions, the Supreme Court has addressed the question of whether aerial surveillance of property violates an expectation of privacy that society is prepared to recognize as reasonable. *See Florida v. Riley*, 488 U.S. 445 (1989); *California v. Ciraolo*, 476 U.S. 207 (1986). In *Ciraolo*, the Court concluded that aerial observation of the defendant's property from a height of 1,000 feet did not violate "an expectation of privacy that is reasonable" because it "took place within public navigable airspace in a physically nonintrusive manner." *Ciraolo*, 476 U.S. at 213 (citation omitted); *cf. Giancola v. W. Va. Dep't of Pub. Safety*, 830 F.2d 547, 550-51 (4th Cir. 1987) (holding, under *Ciraolo*, that helicopter flyover of property at 100 feet did not violate Fourth Amendment). In *Riley*, a plurality of the Court concluded that the defendant's Fourth Amendment rights were not violated when law enforcement officers observed marijuana while hovering in a helicopter at an altitude of 400 feet. *See Riley*, 488 U.S. at 451-52 (plurality opinion). In reaching this conclusion, the plurality noted, *inter alia*, that the flight was conducted in compliance with applicable laws and regulations. *See id.* at 451. Justice O'Connor concurred in the judgment, asserting that mere compliance with aviation regulations should not determine whether a Fourth Amendment violation occurred. *See id.* at 453-54 (O'Connor, J., concurring in judgment). Rather, Justice O'Connor maintained that the relevant inquiry was "whether the helicopter was in the public airways at an altitude

at which members of the public travel with sufficient regularity that [the defendant's] expectation of privacy from aerial observation was not one that society is prepared to recognize as reasonable." *Id.* at 454 (internal quotation marks omitted). Because the defendant had produced no evidence that such flights were rare, Justice O'Connor concluded that no Fourth Amendment violation had occurred. *See id.* at 455.

Breza contends that reversal is mandated under Justice O'Connor's concurrence in *Riley*. His argument, however, rests almost entirely on the factual assertion that the helicopter violated FAA regulations by flying as low as 35 feet over his property. The district court rejected Breza's testimony and found that the helicopter fully complied with applicable regulations regarding proper altitude. Additionally, testimony from law enforcement officers established that such flights were a regular occurrence in the area where Breza's farm was located.[3] We therefore conclude that the aerial observation of Breza's property did not violate his Fourth Amendment rights.

### B.

Breza next contends that the law enforcement officers' warrantless entry into the vegetable garden violated his Fourth Amendment rights. The question of whether Breza had a legitimate expectation of privacy in his garden turns upon whether the garden was within the curtilage of the house or, conversely, was an "open field" not subject to the protection of the Fourth Amendment. *See Oliver*, 466 U.S. at 180 (explaining that "only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home"); *Hester v. United States*, 265 U.S. 57, 59 (1924). In *United States v. Dunn*, 480 U.S. 294, 301 (1987), the Supreme Court instructed that

---

[3]In his brief, Breza claims to have testified at the suppression hearing that "overflights by helicopter over his property were definitely rare." Br. of Appellant at 17. This is not exactly what Breza said, however. Breza's testimony did not refer to helicopter flights generally, but rather was given in response to the specific question of whether it was usual for helicopters to fly over his property at the claimed altitude of 35 feet.

> curtilage questions should be resolved with particular refer-
> ence to four factors: the proximity of the area claimed to be
> curtilage to the home, whether the area is included within an
> enclosure surrounding the home, the nature of the uses to
> which the area is put, and the steps taken by the resident to
> protect the area from observation by people passing by.

The Court cautioned, however, that "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

A dispute exists among the circuits regarding the proper standard to be applied in reviewing a curtilage determination by the district court. *See generally United States v. Johnson*, 256 F.3d 895, 901 (9th Cir. 2001) (per curiam) (en banc) (discussing dispute). Several courts have held that because the application of the *Dunn* factors is fact-intensive, review is for clear error. *See, e.g.*, *United States v. Soliz*, 129 F.3d 499, 502 (9th Cir. 1997); *United States v. Benish*, 5 F.3d 20, 23-24 (3d Cir. 1993); *United States v. Swepston*, 987 F.2d 1510, 1513 (10th Cir. 1993). In contrast, the First Circuit has held that under *Ornelas v. United States*, 517 U.S. 690, 699 (1996), the question of whether an area is within the curtilage is ultimately a legal one, and thus is subject to de novo review, while antecedent factual findings are reviewed for clear error. *See United States v. Diehl*, 276 F.3d 32, 37-38 (1st Cir.), *cert. denied*, 71 U.S.L.W. 3236 (U.S. Oct. 7, 2002) (No. 01-10091). We agree with the First Circuit that the *Ornelas* standard—which is the same as that traditionally applied by this circuit to rulings on suppression motions, *see Rusher*, 966 F.2d at 873—applies to curtilage determinations. With this standard in mind, we proceed to review the relevant factors.

### 1.  *Proximity*

"There is not . . . any fixed distance at which curtilage ends." *United States v. Depew*, 8 F.3d 1424, 1427 (9th Cir. 1993). Rather, in determining whether the area searched was "intimately tied to the home," *Dunn*, 480 U.S. at 301, courts have concluded that the proximity of the area to the home must be considered in light of the other

*Dunn* factors. *See, e.g.*, *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598-99 (6th Cir. 1998) (stating that distance of 50-60 yards was "inconclusive" by itself); *Diehl*, 276 F.3d at 39 (observing that 82-foot distance was of "no decisive help" in curtilage determination). Thus, while the fact that the entrance to Breza's garden was only 50 feet from his house would permit a conclusion that the garden was within the curtilage, *cf. Depew*, 8 F.3d at 1427 (noting that distance of 60 feet "is close enough to permit a finding of curtilage if other factors support such a finding"), it does not compel such a conclusion.

## 2.  *Enclosure*

Next, we must consider "whether the area is included within an enclosure surrounding the home." *Dunn*, 480 U.S. at 301. "The proper focus of this factor is on whether interior fencing clearly demarcates the curtilage." *United States v. Traynor*, 990 F.2d 1153, 1158 (9th Cir. 1993). Here, the district court found that Breza's vegetable garden was "defin[ed] off" from the remainder of his yard by an interior fence and a line of landscaping that included an ornamental garden and several trees. J.A. 172. In light of this finding—which we cannot say is clearly erroneous—we agree with the district court that the interior fence separating the garden from the lawn "clearly demarcates" the boundaries of the home. *Cf. Swepston*, 987 F.2d at 1515 (concluding that garden separated from house by fence was not within curtilage). This factor therefore weighs against a ruling that the vegetable garden was within the curtilage of Breza's home.

## 3.  *Use of Property*

The third *Dunn* factor concerns the use of the area claimed to be curtilage. In *Dunn*, the Supreme Court deemed it "especially significant" that law enforcement officials "possessed objective data indicating that" the area claimed to be curtilage was being used for the production of illicit drugs and not for "intimate activities of the home." *Dunn*, 480 U.S. at 302. As in *Dunn*, the officers here had observed marijuana growing in Breza's garden, providing at least some indication that the garden was not used for the intimate activities of home life. *Cf. Traynor*, 990 F.2d at 1158 (concluding that shop used solely for growing marijuana was not within curtilage). And, although "gardening is an activity often associated with the curtilage

of a home," *State v. Rogers*, 638 A.2d 569, 573 (Vt. 1993), the district court found, in light of the size of the garden and the amount of effort Breza expended on it, that the garden was "not just a domestic activity, this [was Breza's] work," J.A. 172. We cannot say that this finding was clearly erroneous in light of the record before the district court. Therefore, the use of the area also weighs against a determination that the vegetable garden was within the curtilage of Breza's home.

### 4.  *Visibility*

Finally, we must consider the steps taken by Breza to shield the vegetable garden from the view of passers-by. We conclude that this factor weighs against a determination that the garden was within the curtilage of Breza's home. Breza did choose his home place because of the remote location. *See Depew*, 8 F.3d at 1428. However, it does not appear that Breza made any additional effort to conceal the vegetable garden from public view. *Cf. Swepston*, 987 F.2d at 1515 (concluding that fence surrounding garden did not support finding of curtilage because it was designed to corral chickens, not to obstruct view).

### 5.  *Conclusion*

Having considered all of the *Dunn* factors, we conclude that Breza's vegetable garden was not "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301. Although the garden was relatively close to Breza's house and Breza had chosen to live in an isolated location, these factors are outweighed by the clear demarcation of the vegetable garden from the landscaped portion of the yard and the uses to which the garden was put.

### III.

For the reasons set forth above, we conclude that neither the aerial surveillance of Breza's property nor the warrantless entry into his vegetable garden infringed upon Breza's Fourth Amendment rights. We therefore affirm the denial of the motion to suppress.

*AFFIRMED*