**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-4559

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DANA JACKSON,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Henry E. Hudson, District Judge. (3:11-cr-00261-HEH-1)

Argued: May 17, 2013                    Decided: August 26, 2013

Before NIEMEYER, AGEE, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge Agee joined. Judge Thacker wrote a dissenting opinion.

**ARGUED:** Robert James Wagner, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellant. Erik Sean Siebert, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Alexandria, Virginia, for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellee.

NIEMEYER, Circuit Judge:

Before dawn on May 26, 2011, Richmond, Virginia police officers pulled two bags of trash from a trash can located behind the apartment that Sierra Cox had rented from the Richmond Redevelopment and Housing Authority. The officers were looking to corroborate a tip from confidential informants that Dana Jackson was selling drugs from the apartment. Jackson, who was Cox's boyfriend and the father of her children, regularly stayed at the apartment.

After recovering items from the bags that were consistent with drug trafficking, the police officers obtained a warrant to search Cox's apartment. The subsequent search uncovered evidence that ultimately led to Jackson's conviction for drug trafficking.

Jackson contends that the trash pull violated his Fourth Amendment rights because, as he argues, the police officers physically intruded upon a constitutionally protected area when they walked up to the trash can located near the rear patio of Cox's apartment to remove trash. See Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) (holding that officers conduct a Fourth Amendment search when they make an unlicensed physical intrusion into a home's curtilage to gather information). Jackson also argues that the officers violated his reasonable expectation of privacy in the contents of the trash can, relying primarily on

2

the fact that the trash can was not waiting for collection on the curb of a public street, as was the case in California v. Greenwood, 486 U.S. 35, 41 (1988) (holding that there was no reasonable "expectation of privacy in trash left for collection in an area accessible to the public").

We reject both arguments. The district court found as fact that at the time of the trash pull, the trash can was sitting on common property of the apartment complex, rather than next to the apartment's rear door, and we conclude that this finding was not clearly erroneous. We also hold that in this location, the trash can was situated and the trash pull was accomplished beyond the apartment's curtilage. We conclude further that in the circumstances of this case, Jackson also lacked a reasonable expectation of privacy in the trash can's contents. Accordingly, we affirm the district court's conclusion that the trash pull did not violate Jackson's Fourth Amendment rights.

I

After Richmond police received information from confidential informants that Dana Jackson was dealing narcotics from the rear of 2024 Anniston Street, two officers conducted a trash pull from the trash can located behind the apartment at about 4:00 a.m. on the morning of May 26, 2011, recovering two bags of trash. The two-story apartment was located in Whitcomb

Court, a public housing apartment complex owned by the Richmond Redevelopment and Housing Authority, and was one of six row-house type units in a building that faced Anniston Street. The rear of the building faced a grass courtyard separating it from another similar building. Each apartment in Whitcomb Court had a 10-foot by 20-foot concrete patio outside the back door. The patios were connected to a common sidewalk that ran the length of the building. Between each patio and the common sidewalk was a grass strip, about two to three feet wide. On each patio were two poles for laundry lines -- one near the back door of the apartment and one at the far side of the patio away from the apartment. The common sidewalk running the length of the building led to the sidewalk on Magnolia Street, a side street.

The courtyard between the buildings served as a common area for the persons leasing the units and their visitors. Residents in the buildings described the courtyard as a quiet and peaceful area where children could play and neighbors could congregate. Each building was marked with "No Trespassing" signs, although other residents of the Whitcomb Court complex frequently passed through the courtyard as well as their guests and other visitors.

After inspecting the trash bags at the police station, the Richmond police found items consistent with drug trafficking, including 32 clear plastic sandwich bags with the corners

4

missing and several baggie corners containing a residue. Based on the contents of the trash bags, the police obtained a warrant to search 2024 Anniston Street, where they recovered firearms, cocaine base, cocaine hydrochloride, a digital scale, several razor blades, and $1,557 in cash.

That apartment was leased by the Richmond Redevelopment and Housing Authority to Sierra Cox, who had lived there for several years with her children. Dana Jackson, her boyfriend and the father of her children, routinely stayed in the apartment. At the time of the search, both Cox and Jackson were in the apartment with their children, and Cox authorized the forced entry into a safe where much of the evidence of drug activity was found. The police then arrested both Jackson and Cox.

After Jackson was indicted, he filed a motion to suppress the evidence seized during the search of the apartment, contending that the trash pull, which led to the search, was an unconstitutional search and seizure. At the suppression hearing, the evidence showed that the trash at Whitcomb Court was picked up on Thursday mornings and that, for trash collection, the residents in the building that included 2024 Anniston Street generally rolled their trash cans down the common sidewalk to the sidewalk on Magnolia Street. Richmond Police Officers Michael Verbena and Eric Fitzpatrick testified, however, that at about 4:00 a.m. on Thursday, May 26, 2011, they

5

found the trash can for 2024 Anniston Street located behind the unit and beyond the patio, sitting partially on the two-to-three foot grass strip and partially on the common sidewalk. The officers stated that they stood in the grassy area between the patio and the sidewalk and that one officer held the lid up while the other reached in and grabbed two plastic trash bags, each tied with a knot. They explained that they "never had to step onto [the] patio to grab [the] trash."

Cox testified that because her trash can had been stolen from her patio previously, she normally locked it to the laundry pole on the patio that was close to the rear door of her apartment. Before collection, however, she unlocked the trash can from the pole to take it out for collection. She stated that at the time of the officers' trash pull, she did not know where the trash can was or whether it had been unlocked.

Cox also acknowledged that she did not use her trash can for storage but rather for disposal of trash -- "stuff [she] want[ed] to get rid of . . . stuff . . . [she] d[i]dn't want anymore."

In denying Jackson's motion to suppress the evidence seized from the apartment, the district court found as a fact that the "trashcan was located immediately adjacent to the sidewalk, with a portion of the trashcan protruding onto the sidewalk" and with the remaining portion sitting on the strip of grass between the

sidewalk and the patio. The court further held that this location was outside of the apartment's curtilage, noting that "the area beyond the concrete patio [was] part of the common area within the Whitcomb Court apartment complex, rather than part of the defendant's leased property."

As to any expectation of privacy, the court concluded that Jackson "did not have a subjective expectation of privacy in the trash <u>at the time</u> it was searched by the officers," reasoning that Jackson had not adequately shown an intent to keep the contents of the trash can private. The court also concluded that even if Jackson had a subjective expectation of privacy, it was not an objectively reasonable one, relying on the Supreme Court's holding in <u>California v. Greenwood</u>, 486 U.S. 35, 41 (1988), that there can be no reasonable "expectation of privacy in trash left for collection in an area accessible to the public." Rejecting Jackson's effort to distinguish <u>Greenwood</u>, the court noted "that the fact that neither the defendant nor Cox had pulled the trashcan around to the curb [on Magnolia Street] for third-party disposal [was] not dispositive," explaining that what mattered was whether Cox and Jackson had exposed their garbage to the public. The court concluded that they had done so by "placing the trashcan adjacent to the sidewalk" so that it was "readily accessible to neighbors and

7

other visitors in the apartment complex," thereby "relinquishing any objectively reasonable expectation of privacy."

After the district court denied Jackson's motion to suppress, Jackson pleaded guilty to drug trafficking, in violation of 21 U.S.C. § 841, reserving his right to appeal the district court's order denying his motion to suppress. The court sentenced him to 137 months' imprisonment.

Jackson filed this appeal, raising the issue of whether the trash pull violated his rights under the Fourth Amendment.

II

Jackson mounts a multifaceted challenge to the district court's ruling, beginning with the argument that the court's factual finding regarding the location of the trash can was clearly erroneous. He then argues that even if we were to accept the district court's factual finding about where the trash can was located at the time of the trash pull, we should nonetheless find the search unconstitutional under the Supreme Court's recent decision in Florida v. Jardines, 133 S. Ct. 1409 (2013). He explains, in this regard, that "the search of [his] trash can involved police officers trawling for evidence on and around [his] back porch, an area immediately surrounding his residence and protected under Jardines from police intrusion that is not explicitly or implicitly permitted by the resident." (Internal quotation marks omitted). Finally, he contends that

8

he had a reasonable expectation of privacy in the trash can and its contents because it "was directly behind the residence, was not left out for collection, and was in a 'no trespassing' area." As such, he maintains, his case "is clearly distinguishable from Greenwood," which held that the Fourth Amendment does not prohibit "the warrantless search and seizure of garbage left for collection outside the curtilage of a home." Greenwood, 486 U.S. at 37.

The government contends that "the record fully supports the district court's finding as to the trash can's location." It also maintains that the district court correctly held that the trash can's location was outside the apartment's curtilage and that, because the officers did not enter the curtilage, Jardines is inapplicable. Moreover, the government asserts, "by placing his trash adjacent to a publicly accessible sidewalk, off his property, defendant most assuredly forfeited any expectation of privacy that society would accept as objectively reasonable."

These conflicting contentions thus present us with three related issues: (1) whether the district court clearly erred in its factual finding regarding the trash can's location; (2) whether that location was within the apartment's curtilage, so that the officers' actions amounted to an impermissible "unlicensed physical intrusion" of a "constitutionally protected area," Jardines, 133 S. Ct. at 1415; and (3) if not, whether

9

Jackson nonetheless had a reasonable expectation of privacy in the trash can's contents.

A

Jackson's challenge to the district court's factual finding regarding the trash can's location at the time of the trash pull requires a showing of clear error. See Ornelas v. United States, 517 U.S. 690, 699 (1996). Clear error is demonstrated, even if there is evidence to support the finding of fact, when the reviewing court, considering all of the evidence, "is left with the definite and firm conviction that a mistake has been committed." United States v. Breza, 308 F.3d 430, 433 (4th Cir. 2002) (internal quotation marks omitted).

In this case, the Richmond police officers gave specific testimony regarding where they found the trash can in the early morning hours of May 26, 2011, and -- as the district court emphasized -- none of Jackson's witnesses could provide direct evidence to contradict their testimony. They could only speak to where Cox normally kept her trash can. In light of this discrepancy in the specificity of the witnesses' testimony, combined with the district court's unique ability to evaluate the credibility of witnesses, we simply cannot conclude that the district court clearly erred in finding that "the trashcan was located immediately adjacent to the sidewalk, with a portion of

the trashcan protruding onto the sidewalk" while the rest of the can sat on the "two or three foot wide strip of grass" between the common sidewalk and the residence's patio.

B

With this factual finding affirmed, we turn to a de novo review of the district court's conclusion that the officers' actions did not involve an unlicensed physical intrusion of a constitutionally protected area so as to constitute an illegal search or seizure under the Fourth Amendment.

The Fourth Amendment, of course, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Supreme Court has recently emphasized that this text "establishes a simple baseline" -- namely, "[w]hen the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." Jardines, 133 S. Ct. at 1414 (citing United States v. Jones, 132 S. Ct. 945, 950-51, 950 n.3 (2012)) (internal quotation marks omitted). Applying this "traditional property-based understanding of the Fourth Amendment," id. at 1417, the Jardines Court held that "using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a

11

'search' within the meaning of the Fourth Amendment," id. at 1413. The Court explained that by going onto the home's front porch, the officers had undoubtedly entered the home's curtilage -- that is, the "area immediately surrounding and associated with the home" that is treated "as part of the home itself for Fourth Amendment purposes." Id. at 1414 (internal quotation marks omitted). And because "the officers' investigation took place in a constitutionally protected area," it was a search implicating the Fourth Amendment unless the officers had license, either explicit or implicit, to gather information there. Id. at 1415. The Court concluded that the officers lacked such permission because "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." Id. at 1416.

Under Jardines, if Richmond Police Officers Verbena and Fitzpatrick breached the curtilage of Cox's apartment when they conducted the trash pull, it would be fairly clear that their actions in opening the trash can's lid and taking the two trash bags would implicate the protections of the Fourth Amendment. For surely if bringing a drug-sniffing dog onto a home's front porch is beyond the scope of the implied license that invites a visitor to the front door, so too is rummaging through a trash can located within the home's curtilage.

12

In this case, the parties agree that the curtilage of Cox's residence included the concrete patio behind her apartment. They dispute, however, whether the area immediately beyond the patio, including the two-to-three-foot strip of grass between the patio and the common sidewalk, as well as the sidewalk itself, was part of the curtilage.

The test used to determine the boundaries of a home's curtilage is not "a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." United States v. Dunn, 480 U.S. 294, 301 (1987). In Dunn, the Supreme Court instructed "that curtilage questions should be resolved with particular reference to four factors: [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." Id. At the same time, though, the Court cautioned that "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration -- whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id.; see also Oliver v. United States, 466 U.S. 170, 182 n.12 (1984) (describing the

13

"conception defining the curtilage . . . as the area around the home to which the activity of home life extends").

Application of the four <u>Dunn</u> factors points predominantly to the conclusion reached by the district court in this case -- "that the trashcan was situated outside of the curtilage of the residence . . . at 4:00 a.m. on May 26, 2011." First, with respect to proximity, the strip of grass on which the trash can partially sat (and on which the officers stood) was beyond the end of the patio and therefore at least 20 feet from the apartment's back door. Although a 20-foot distance is not great, in the context of an apartment complex with multiple units sharing a common area, the 20-foot distance is not so close as to require the conclusion that the curtilage extended that far. <u>See</u> <u>Breza</u>, 308 F.3d at 435-46. As to the second and fourth factors, the area was not "included within an enclosure surrounding the home," nor did Cox and Jackson take any steps to shield the area from view of people passing by. What is most telling, however, is the third <u>Dunn</u> factor -- the use to which the area claimed to be curtilage was put. The evidence indicates that the courtyard between the apartment buildings was a common area used by all residents in the apartment complex. The common courtyard area was a grassed area that had common sidewalks running through it, by which residents could walk to other apartments and to Magnolia Street. The two-to-three foot

14

strip of grass between the patio and the sidewalk was part of this common area, and the line between the patio and the grass marked the boundary between the particular property conveyed by lease to each tenant and the apartment complex's common property. In these circumstances, then, we conclude that the apartment's curtilage extended to the end of its back patio but not further, because the area beyond the patio, including the two-to-three feet between the patio and the common sidewalk, was not "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Dunn, 480 U.S. at 301.

Accordingly, we affirm the district court's conclusion that the officers here pulled the trash bags from a trash can located outside the apartment's curtilage. Because they did not physically intrude upon a constitutionally protected area, we conclude that Jackson cannot prevail under the property-based approach to the Fourth Amendment articulated in Jardines.

C

The Jardines analysis does not end the Fourth Amendment inquiry, however, because, as Jardines itself makes clear, "property rights are not the sole measure of Fourth Amendment violations" and "[t]he Katz reasonable-expectations test has been added to . . . the traditional property-based understanding

15

of the Fourth Amendment." Jardines, 133 S. Ct. at 1414, 1417 (referring to Katz v. United States, 389 U.S. 347 (1967)) (internal quotation marks omitted). We therefore also address whether Jackson had a reasonable expectation of privacy in the trash can's contents.

The Supreme Court confronted a very similar set of facts in Greenwood, where it held that the Fourth Amendment does not prohibit "the warrantless search and seizure of garbage left for collection outside the curtilage of a home." 486 U.S. at 37. There, an enterprising police officer had "asked the neighborhood's regular trash collector to pick up the plastic garbage bags that Greenwood had left on the curb in front of his house and to turn the bags over to her without mixing their contents with garbage from other houses." Id. In holding that practice lawful, the Supreme Court accepted the fact that the defendants likely "did not expect that the contents of their garbage bags would become known to the police or other members of the public" but nonetheless concluded that the defendants had "exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection." Id. at 39-40.

We conclude that Greenwood's rule controls here. To be sure, there are some factual differences, key among them being that Greenwood's trash had been left on the curb of a public street for collection, whereas Jackson and Cox had not yet taken

16

their trash can to Magnolia Street, where the garbage collector regularly collected it. But the critical inquiry driving the Court's decision in Greenwood was the extent to which the defendants had "exposed their garbage to the public," thus eliminating any "reasonable expectation of privacy in the inculpatory items that they discarded." Id. at 40-41. By that measure, Jackson's claim to Fourth Amendment protection for the trash can fails. For rather than being locked to the laundry pole closest to the residence's back door, where it was normally located, the trash can was sitting in the common area of the apartment complex courtyard, which included the grass areas and common sidewalks, readily accessible to all who passed by. Moreover, as Cox testified, the trash can contained "stuff [she] want[ed] to get rid of," stuff she "d[i]dn't want anymore." Put simply, having left the trash can outside the curtilage of their home, in a common area shared by the other residents of the apartment complex and their guests, Jackson cannot now claim to have had a reasonable expectation of privacy in its contents. As in Greenwood, the trash can containing Jackson's discarded refuse was "readily accessible to animals, children, scavengers, snoops, and other members of the public." Id. at 40.

For these reasons, we conclude that the trash pull that the Richmond Police conducted on May 26, 2011, was a lawful investigatory procedure and accordingly affirm the district

17

court's order denying Jackson's motion to suppress. Jackson's judgment of conviction is accordingly

AFFIRMED.

THACKER, Circuit Judge, dissenting:

The Fourth Amendment is clear: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. In several recent decisions, the Supreme Court has reaffirmed that at its "very core," the Fourth Amendment stands for "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Florida v. Jardines, ___ U.S. ___, 133 S. Ct. 1409, 1414 (2013) (internal quotation marks omitted).

"This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity." Id. at 1414. Although my good colleagues in the majority cast this decision narrowly based on the facts found by the district court, see ante at 3 ("The district court found as fact that at the time of the trash pull, the trash can was sitting on common property of the apartment complex."), even accepting the facts found by the district court, I cannot subscribe to a version of the Fourth Amendment that permits agents of the state to conduct a warrantless search of a citizen's trashcan where the receptacle is located directly behind their home and not otherwise abandoned or left for collection along a public thoroughfare,

19

see California v. Greenwood, 486 U.S. 35, 39–41 (1988).  For

these reasons, I respectfully dissent.

I.

A.

The Area of the Search

The property of concern in this case is part of a

larger development called Whitcomb Court, which is owned and

managed by the Richmond Redevelopment Housing Authority

("Housing Authority").  Whitcomb Court is made up of a number of

buildings each containing six row houses.  Jackson's home was

located in one of these buildings and was adjacent to Anniston

Street in Richmond, Virginia.  The building located next to

Jackson's building is also next to Anniston Street, but is

angled such that the two buildings appear similar in form to two

sides of a triangle, leaving a funnel-like opening through which

residents may access Anniston Street.  See J.A. II Ex. 1.[1]

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.  Additionally, for ease of reference, the photographs contained in Exhibits 1, 2, 4, 11, 12 and 13 are appended hereto.

Exhibit 1 portrays an aerial view of the two buildings at issue, and is appended to this opinion to assist the reader. The funnel-like opening at the access point to the internal courtyard is indicated by the convergence of the two buildings in the top right quadrant of the photograph, although the fence and part of the internal walkway is obscured by trees.  That area is more accurately depicted by the photographs appended in Exhibits 11 and 12.

A wrought iron fence separates Anniston Street from the apex point at which the two buildings meet, leaving only the funneled opening in the fence for an internal walkway that intersects the public sidewalk along Anniston Street.[2] See J.A. II Ex. 11, Ex. 12. Notably, it is undisputed that the internal walkway is not a "through" walkway. No alleys, no through sidewalks, no driveways, and no streets transect or abut the area directly behind Jackson's home where the trash pull was conducted. And, according to Whitcomb Court property manager Clementine Robinson, the areas behind the residences -- the patio areas -- are private areas of each tenant. J.A. at 112; see also J.A. at 122 (Jackson's neighbor, Asia Morris, stated that the patio area is her "private area."); J.A. II Ex. 2, Ex. 3, Ex. 12.

Moreover, the area where the trash pull occurred is surrounded by "no trespassing" signs positioned by the Housing Authority. Six "no trespassing" signs were affixed to each building in Whitcomb Court, one on each side of the buildings, and two on the front and the back of each building. The signs read, "NO TRESPASSING By the Order of RRHA," the Richmond

---

[2] In order to maintain clear distinctions among the various paved areas, I denote the public strip of pavement parallel to Anniston Road as the "sidewalk," and that directly behind each of the two buildings at Whitcomb Court as the internal "walkway."

21

Redevelopment Housing Authority. The signs are white with black lettering and are readily observable, night or day. In fact, Officer Michael Verbena testified that the area behind the two buildings was "private property," that there were two "no trespassing" signs on the interior back sides of both of the buildings facing where the trash pull was conducted, and that the signs are "clearly marked." J.A. at 58, 68; J.A. II Ex. 2, Ex. 11, Ex. 12.

B.

The Weekly Trash Collection

Significantly, in order for the trash collectors to pick up the trash from Whitcomb Court, the trashcans behind each residence must be brought by the tenants from their rear patios, along the Whitcomb Court internal walkway, around the apartment building, through the opening in the wrought iron fence, past several "no trespassing" signs, and to the public curb on Anniston Street. Indeed, the trash collectors do not traverse behind the row houses and onto the patios of the residences or the internal walkway to pick up trash. The trash is not left for collection behind the residences; only when the trash is brought to the public street is it exposed to public passersby and subject to collection by the trash removal company.

C.

The Location of the Trashcan

Even accepting the location of the trashcan as found by the district court in a light most favorable to the Government, the receptacle was assuredly on the home's curtilage and plainly safe from a warrantless search by agents of the state.

Nonetheless, the precise location of the trashcan at the time of the search is in dispute, and for good reason. Jackson's investigator, Linda McGrew, testified that property manager Robinson told her that she had never seen a trashcan on the internal walkway at Whitcomb Court, and that the trashcans are instead kept on the patio areas of each residence. Each witness who lived in the development likewise testified that trashcans are not kept on the walkways in Whitcomb Court. Jackson's neighbor Sharice Smith testified that there is a rule in the apartment complex against having trashcans on the walkway. Smith also stated that she had never seen a trashcan in Whitcomb Court on the walkway in her five years of living there. Asia Morris, who lived next door to Jackson, likewise testified that in all the years she lived at Whitcomb Court, she had never seen a trashcan on the internal walkway.

In contrast, Officers Verbena and Eric Fitzpatrick presented inconsistent versions of events.

23

Officer Fitzpatrick testified that the trashcan was located "on the sidewalk," meaning the internal rear walkway at Whitcomb Court.[3] J.A. 98. He then stated that in the photograph that is depicted in Exhibit 2 he was standing "approximately where the trashcan was located on that sidewalk." J.A. 59-61, 98-99; J.A. Ex. 2. In that photograph, Officer Fitzpatrick appears to be standing completely on the walkway. However, Officer Fitzpatrick indicated that the trashcan could have been "inches" in one direction or another. J.A. 102.

Notably, the officers' pictorial recreation of where the trashcan was located on the night in question actually took place six and a half months after the fact, in preparation for the then-forthcoming suppression hearing.[4] Officer Fitzpatrick also confirmed that it was dark the night of the trash pull and that he had done at least ten trash pulls with Officer Verbena on that particular night. Significantly, however, in Officer Verbena's affidavit for the search warrant of Jackson's residence -- generated on the same day as the trash pull -- he

---

[3] See supra note 2 and accompanying text. While the officers use the term "sidewalk" to describe the internal paved path between the buildings of Whitcomb Court, I adopt the more accurate term "walkway."

[4] The trash pull occurred at approximately 4:00 a.m. on May 26, 2011. The photographs purporting to recreate the location of the trash pull were taken on December 13, 2011. The suppression hearing was held on February 14, 2012.

24

described the trashcan as being situated "directly behind" the residence, with no mention of it being on or near the internal walkway. J.A. II 9.

Officer Verbena's testimony contained further troubling inconsistencies. Initially, Officer Verbena testified that the trashcan was "seven to ten yards from the back door off the sidewalk," J.A. 54, "right off the sidewalk." J.A. 53 (emphasis supplied).[5] Then, when the district court asked specifically how far the trashcan was from the sidewalk, Officer Verbena altered his testimony and said the trashcan was "basically almost touching the sidewalk, if not on -- partly on the sidewalk." J.A. 55. Finally, in response to the district court's question regarding how far the trashcan was from the patio, the trashcan "moved" further to a point at which it was "almost completely on the sidewalk. So I'd say maybe a foot off the patio actually is where the trashcan was, give or take." J.A. 56 (emphasis supplied). So, in the span of time from the point at which Officer Verbena drafted his search warrant affidavit on the day of the trash pull to the time he testified at the suppression hearing eight and a half months later, the location of the trashcan shifted from 1) "directly behind" the residence; to 2) "off" the sidewalk; to 3) "if not on -- partly

---

[5] See supra note 3.

25

on the sidewalk;" and, finally, to its ultimate resting place 4) "almost completely on the sidewalk." J.A. 53-56; J.A. 9.

Crediting a less constitutionally offensive version of the officers' shifting and conflicting testimony, the district court found that the trashcan was at the time of the search located "immediately adjacent" to the walkway running behind Jackson's home, as well as "positioned partially on" the walkway, "with the lid opening toward the house." <u>United States v. Jackson</u>, 3:11CR261-HEH, 2012 WL 529814, at *4 (E.D. Va. Feb. 17, 2012).

The district court did not explain whether the trashcan was also touching the patio or if it was located on the small patch of grass or cement step between the internal walkway and Jackson's patio. The district court was simply not clear about the precise location of the trashcan. This is perhaps understandable given the state of the officers' shifting testimony in this case. But, the location of the trashcan is of monumental importance for determining curtilage, property interests, and legitimate privacy interests. Even accepting the district court's finding that the trashcan was at least "positioned partially on" the internal walkway, <u>id.</u>, logic dictates that the remainder of the receptacle would have also been resting on the patio or the small patch of grass or cement

26

step directly behind Jackson's residence -- an area the district court should have determined was curtilage as a matter of law.

Indeed, the district court rested its decision on its finding that the trashcan was "adjacent" to the internal walkway, which was in its view "publicly accessible" and a "common easement," although this latter term is not defined in the record. J.A. 177-78. There is some dispute regarding how accessible the internal walkway was to members of the public, but it is clear from the fence along Anniston Road and the fact that the walkway was not a "through-way," that the internal walkway was for residents and their guests accessing the back patios -- not for members of the public to use as a path to another destination. This conclusion becomes more clear in light of the numerous "no trespassing" signs posted all along the complex walls.

## II.

The Fourth Amendment "establishes a simple baseline . . . : When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" Florida v. Jardines, ___ U.S. ___, 133 S. Ct. 1409, 1414 (2013) (quoting United States v. Jones, ___ U.S. ___, 132 S. Ct. 945, 950-951 & n.3 (2012)). The Supreme Court has denoted this original understanding of the Fourth

27

Amendment as embodying a "common-law trespassory test." <u>Jones</u>, 132 S. Ct. at 952.

A Fourth Amendment violation also occurs when government officers violate a person's "reasonable expectation of privacy." <u>Katz v. United States</u>, 389 U.S. 347, 360 (1968) (Harlan, J., concurring). Notably, "though <u>Katz</u> may add to the baseline, it does not subtract anything from the Amendment's protections 'when the Government does engage in [a] physical intrusion of a constitutionally protected area.'" <u>Jardines</u>, 133 S. Ct. at 1414 (quoting <u>United States v. Knotts</u>, 460 U.S. 276, 286 (1983) (Brennan, J., concurring)); <u>see also</u> <u>Jones</u>, 132 S. Ct. at 952 ("[T]he <u>Katz</u> reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." (emphases removed)).

Thus, in conducting a search, the Government may violate an individual's Fourth Amendment rights in two different ways: 1) by physically intruding on the individual's property in an unreasonable manner, and 2) by violating an individual's reasonable expectation of privacy. In my view, the warrantless search of Jackson's trashcan, located directly behind his home in a private area, was an unreasonable search under both approaches.

A.

The Protection of Property Interests

The Fourth Amendment "'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." Jardines, 133 S. Ct. at 1414 (quoting Oliver v. United States, 466 U.S. 170 (1984)). Although not all investigations conducted on private property are subject to the Amendment's protection, see Hester v. United States, 265 U.S. 57 (1924) (recognizing the "open fields" doctrine), "when it comes to the Fourth Amendment, the home is first among equals." Jardines, 133 S. Ct. at 1414. The Supreme Court explained:

> At the Amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S. Ct. 679, 5 L. Ed. 2d 734 (1961). This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window.

> We therefore regard the area "immediately surrounding and associated with the home" -- what our cases call the curtilage -- as "part of the home itself for Fourth Amendment purposes." Oliver, [466 U.S.] at 180, 104 S. Ct. 1735. . . . This area around the home is "intimately linked to the home, both physically and psychologically," and is where "privacy expectations are most heightened." California v. Ciraolo, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L. Ed. 2d 210 (1986).

29

Id. at 1414-15 (emphasis supplied).  Thus, we first look to whether the trashcan at the time of the warrantless search was located on the curtilage of Jackson's residence.

The Supreme Court has prescribed a multi-factor test to guide curtilage determinations:

> [C]urtilage questions should be resolved with particular reference to four factors: [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

United States v. Dunn, 480 U.S. 294, 301 (1987).  The Court cautioned, however, that "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration -- whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."  Id.[6]

Crediting the testimony of Officers Verbena and Fitzpatrick, the district court concluded that the trashcan was beyond the curtilage of the home at the time of the trash pull

---

[6] "While the boundaries of the curtilage are generally 'clearly marked,' the 'conception defining the curtilage' is at any rate familiar enough that it is "easily understood from our daily experience."  Jardines, 133 S. Ct. at 1415 (quoting Oliver, 466 U.S. at 182 n.12).

because, at that time, it was "positioned directly next to the sidewalk, with a portion of the can actually protruding onto the sidewalk," and "not chained or otherwise secured."[7]  United States v. Jackson, 3:11CR261-HEH, 2012 WL 529814, at *4 (E.D. Va. Feb. 17, 2012).  I disagree.

## 1.

### Proximity of the Area to the Home

"There is not . . . any fixed distance at which curtilage ends."  United States v. Breza, 308 F.3d 430, 435 (4th Cir. 2002) (internal quotation marks omitted).  "Rather, in determining whether the area searched was intimately tied to the home, . . . the proximity of the area to the home must be considered in light of the other Dunn factors."  Id. (internal quotation marks and citation omitted).  Based on Officer Verbena's testimony as credited by the district court, the trashcan "was located seven to ten yards from the back door of the house, past a concrete patio which extends approximately twenty feet out from the rear entrance."  Jackson, 2012 WL 529814, at *5.

In United States v. Breza, we reasoned that while the defendant's garden, the location of the disputed search, "was only 50 feet from his house [and] would permit a conclusion that

---

[7] See supra note 3.

31

the garden was within the curtilage, it does not compel such a conclusion." 308 F.3d at 436. Cf. United States v. Depew, 8 F.3d 1424, 1427 (noting that distance of 60 feet is close enough to permit a finding of curtilage if other factors support such a finding). Similarly, in this case the district court's factual determination that the trashcan was at most 30 feet from Jackson's backdoor is not alone dispositive as to a finding of curtilage. However, when viewed in light of the enclosed environment of the housing complex and the nature of the location's purpose -- i.e., to store noxious waste far enough away from the home but not left for collection -- the relatively close proximity of the trashcan to the rear of Jackson's home counsels strongly in favor of concluding the trashcan was within the curtilage.

## 2.

### Enclosure of the Area

We must also consider "whether the area is included within an enclosure surrounding the home." Dunn, 480 U.S. at 301. "The proper focus of this factor is on whether interior fencing clearly demarcates the curtilage." Breza, 308 F.3d at 436 (quoting United States v. Traynor, 990 F.2d 1153, 1158 (9th Cir. 1993) (internal quotation marks omitted)). In this case, there was no enclosure of Jackson's individual unit within the building. But nearly as important, the building containing

32

Jackson's home was largely enclosed. As noted, the main point of access to Jackson's home is through a funneled opening of the wrought iron fence just off the public sidewalk along Anniston Street. See J.A. II Ex. 11, Ex. 12. Opposite Jackson's patio, the courtyard is bounded by the rear of the neighboring row houses. See J.A. II Ex. 1, Ex. 4. And at the opposite end of the funneled entry to Anniston Street, the courtyard is hemmed in by a retaining wall bordering a neighboring baseball field. See J.A. II Ex. 1, Ex. 4. Thus, the building of which Jackson's home is a part is at least partially enclosed, as it is bounded on all sides in one form or another. See United States v. Redmon, 138 F.3d 1109, 1130 (7th Cir. 1998) (en banc) (Posner, J., dissenting) ("The curtilage would rarely extend beyond the house itself if complete, opaque enclosure were required. Few people, other than the very wealthy, barricade their front yard so completely that a person seeking to enter must request the unlocking of a solid gate that is higher than eye level.").

3.

The Uses of the Area

In this case, the area claimed to be the curtilage includes the patio immediately behind Jackson's home, as well as the grass surrounding it between the patio and the internal walkway. The patio includes a clothesline, held by two posts. Each residential unit is required by the development's rules to

33

keep residents' trashcans, among other items of personal property, on the patio area. Thus, the patio area is essentially the individual resident's back yard.

Although the Government claims that this area was "accessible" by the public, it fails to point to any facts suggesting the patios were actually put to public use. And, critically, the officers themselves conceded that the rear walkway was not subject to "through" traffic, and that the area behind the two buildings was "private property." See J.A. 58, 67-68, 91. Merely because members of public can or have on occasion accessed the rear walkway and courtyard does not mean the Government may conduct warrantless searches of the entire area with abandon. Such logic reduces the residents' curtilage to a nullity.[8]

---

[8] The district court reasoned, "by placing the trashcan adjacent to the sidewalk -- readily accessible to neighbors and other visitors in the apartment complex -- the defendant exposed the trashcan to the public-at-large. . . ." Jackson, 2012 WL 529814 at *6. In response to the residents' undisputed testimony that the internal walkway was "not generally accessed by strangers," the district court responded: "However, this was not a gated community. Residents, visitors, and other non-residents could access the common area and the sidewalk at will." Id. at *6 n.5.

But, citizens with smaller lot sizes should not be accorded any less Fourth Amendment protection than those who have the luxury of much larger grounds, including larger driveways and back yards such that they may store their trash at a further distance from the public collection point.

34

4.

Steps Taken to Protect the Area from Observation

Here, the area claimed to be the curtilage by Jackson is completely open to his Whitcomb Court neighbors: no fences or other barriers inhibit open observation from the rear courtyard area of the complex. Nevertheless, the courtyard area between the buildings is secluded from public view (from the public street-sidewalk area) by a metal fence. More importantly, there are multiple "no trespassing" signs located on the rear wall of the two apartment row buildings. Indeed, according to the property manager and residents, the areas behind the individual units -- the patio areas -- are private areas of each tenant. See J.A. at 112, 122. Clearly, this was not an area designed to allow unhindered public travel and public observation; rather, it was limited to residents and their guests.[9]

Upon consideration of the Dunn factors as applied to the facts of this case -- even crediting the officers' shifting testimony (which was inconsistent at best) -- the district court's legal conclusion that the trashcan was not located on

---

[9] The Government claims that because its officers and Jackson's investigator were able to come and go on the apartment complex property without difficulty on a few occasions, we should consider the area completely "public" despite the "no trespassing" signs. However, whether the rule against trespassing was enforced on these particular occasions does not make the presence of the signs any less important for the multifactor curtilage determination.

Jackson's curtilage was error. The proximity of the trashcan to Jackson's home, and the fact that the area was largely enclosed, militate in favor of determining that the trashcan was indeed within the curtilage.

B.

The Protection of Privacy Interests

In addition to the search of the trashcan being unreasonable under the trespassory test, Jackson had a reasonable expectation of privacy in his trashcan when it had not been left for collection, but was rather kept behind the home for temporary storage of personal waste. As noted by the Court in Jardines, this analysis overlaps with the property interest-based Fourth Amendment analysis. See Jardines, 133 S. Ct. at 1418-19 (Kagan, J., concurring).[10] As explained, the

---

[10] Justice Kagan's concurring opinion in Jardines makes this clear:

> It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property naturally enough influences our shared social expectations of what places should be free from governmental incursions. And so the sentiment "my home is my own," while originating in property law, now also denotes a common understanding -- extending even beyond that law's formal protections -- about an especially private sphere. Jardines' home was his property; it was also his most intimate and familiar space. The analysis proceeding from each of those facts, as today's decision reveals, runs mostly along the same path.

(Continued)

36

protections of the Fourth Amendment are also activated when the state conducts a search or seizure in an area in which there is a "constitutionally protected reasonable expectation of privacy." New York v. Class, 475 U.S. 106, 112 (1986) (citation omitted).

The seminal case governing analysis in this regard is California v. Greenwood, 486 U.S. 35 (1988). In Greenwood, the Supreme Court held that a defendant has no reasonable expectation of privacy in refuse left for collection on or "at the side of a public street that is readily accessible to animals, children, scavengers, snoops, and other members of the public." Id. at 40. The Court explained that the defendants:

> placed their refuse at the curb <u>for the express purpose of conveying it to a third party</u>, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so. Accordingly, having deposited their garbage in an area particularly suited for public inspection and, in a manner of speaking, public consumption, <u>for the express purpose of having strangers take it</u> . . . respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded.

Id. at 40-41 (internal quotation marks and citations omitted) (emphasis supplied).

---

Jardines, 133 S. Ct. at 1418-19 (Kagan, J., concurring) (internal quotation marks and citations omitted).

In contrast, here Jackson's trashcan was not placed at the public curb for collection, but, rather, was located on the internal walkway of the Whitcomb Court building complex "directly behind" Jackson's residence.  See J.A. II 9.  Indeed, the officers acknowledge that the trashcan was located at or near the internal walkway next to Jackson's patio and the district court found that it was located adjacent to the internal walkway.  Therefore, it is incorrect to say that Jackson's garbage -- like Greenwood's -- could be searched by the police because where it was placed was accessible to "animals, scavengers, and snoops."  Greenwood, 486 U.S. at 40. Greenwood's garbage was not on private property or on his curtilage; Jackson's was.  The Government does not explain how Jackson's trashcan was any less accessible to "animals, scavengers, and snoops" had it been located entirely on his patio.  Id.

The Government appears to contend that the conclusion it reaches, namely, that Jackson had no reasonable expectation of privacy, follows naturally from Greenwood.  See Government's Br. at 22 ("The key factor . . . is whether the 'respondents exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection.'"  (quoting Greenwood, 486 U.S. at 40)).  But any entitlement the police may have to search the trashcan is dependent upon its location on the defendant's

38

property, as the location is in this case the primary indicator of whether Jackson intended to relinquish his legitimate expectation of privacy. Storage of the trashcan so close to the rear of his home -- within its curtilage, I submit -- indicates that it was not intended to be relinquished.

Further, as explained, members of the public intent on scavenging or snooping in Jackson's trash would need to access it by 1) stepping onto the internal walkway through the opening in the fence alongside Anniston Street; 2) travelling along the internal walkway from the street, between the two fences and the two buildings, which leads only to the private courtyard and patio areas; and 3) at the fork in the walkway that leads either to the walkway behind Jackson's building or to the walkway behind the opposite building, taking the walkway to the left to Jackson's patio area, passing multiple "no trespassing" signs in the process. Appellant estimates, and the Government does not dispute, this entire trek from the public sidewalk where trash is left for collection to the rear of Jackson's residence where the trash pull occurred is approximately 50 yards from start to finish. Thus, Jackson's reasonable privacy interest remains intact under Greenwood.

In sum, the officers' unjustified probe of Jackson's trashcan when not left for collection or otherwise abandoned constituted a search falling under the purview of the Fourth

Amendment under the principles recently espoused in <u>Jardines</u> as well as those set forth in <u>Katz</u>. Absent a warrant or the presence of any exception thereto, the officer's trawling, exploratory search was patently unreasonable. Accordingly, the district court erred by refusing to suppress the evidence tainted by the fruits of the illegal search of Jackson's trashcan.

III.

For the foregoing reasons, I would reverse the judgment of the district court.

Google



Photos

GOVERNMENT
EXHIBIT

1

Show All - animals architecture art autumn beach bridge building buildings castle church city clouds flowers hdr lake landscape mountain mountains nature night panorama park people river sea sky snow summer sunset travel trees water winter

Ex. p. 001



GOVERNMENT EXHIBIT 2



GOVERNMENT EXHIBIT 4

Ex. p. 004



Ex. p. 011



010

Ex. p. 012



Ex. p. 013